07-3018-cr
*USA v. Luna (USA)*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: June 19, 2008                    Decided: October 16, 2008)

Docket No. 07-3018-cr

_____

UNITED STATES OF AMERICA,

*Appellant,*

v.

WARREN HAWKINS, ALSO KNOWN AS PAUL, ALSO KNOWN AS HAWK,

*Defendant-Appellee,*

Alex Luna, Nicky Carrasquilla, also known as Nicky Gomez, Jose R. Adames, also known as Ponpa, also known as Pon, also known as Pong, Nelson Rosa, also known as Pee Wee, Bobby Medina, also known as Mr. B., Alex Salcedo, Juan Rodriguez, also known as Juan G, also known as Juan Prosser, also known as John Prosser, also known as Juan Garcia, Maria Robles, also known as Mari, William Azcona, also known as Willie, Henry Mayoral, Heriberto Guzman, also known as Crazy Louis, Jose A. Pena, Benny Ramirez, David Melendez, also known as Gary, Joel Bueno, Joshua Febres, Timothy Eberly, Rafael Almontes, also known as Raf, also known as Rafie, Aaron King, also known as A-Mo, Jose Luis Rodriguez, also known as Jose Luis, Arcadio Ramirez, also known as Peti, John #1 Doe, also known as N.Y.S. Trooper Rubio,

*Defendants*.

_____

1

Before:

STRAUB, RAGGI, *Circuit Judges*, SESSIONS,[*] *District Judge*

_____

On appeal from a judgment of acquittal notwithstanding the verdict entered in the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*), acquitting the defendant of conspiring to distribute cocaine upon finding that the proof at trial was insufficient to sustain the jury's verdict. Because we find sufficient evidence to support the jury's determination that the defendant not only had a buyer-seller relationship with the head of the conspiracy but also knowingly and intentionally joined in and participated in the conspiracy, we reverse and remand.

_____

HAROLD H. CHEN, Assistant United States Attorney (Alina M. Reynolds, William J. Nardini, Assistant United States Attorneys, *of counsel*; Kevin J. O'Connor, United States Attorney, Nora R. Dannehy, Acting United States Attorney, *on the brief*), United States Attorney's Office for the District of Connecticut, Bridgeport, CT, *for Appellant*.

JONATHAN J. EINHORN, New Haven, CT, *for Defendant-Appellee*.

_____

STRAUB, *Circuit Judge*:

The government appeals from the judgment of the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*), granting Defendant-Appellee Warren Hawkins's motion for an acquittal notwithstanding the verdict pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. The District Court found that, although the government proved that Hawkins purchased cocaine from what he knew was a cocaine-distribution conspiracy and that the head of the conspiracy knew of Hawkins's intent to resell the cocaine, the government's evidence that Hawkins knowingly and intentionally joined and participated in that

---

[*] The Honorable William K. Sessions III, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846 was insufficient. *See United States v. Hawkins*, No. 05-cr-058, 2007 WL 1732767 (D. Conn. June 15, 2007). For the reasons that follow, we find that the government's evidence was sufficient to prove that Hawkins not only purchased from the conspiracy with a known intent to resell, but he knowingly and intentionally joined and participated in it. Accordingly, we REVERSE the judgment of acquittal and REMAND the case to the District Court for further proceedings consistent with this opinion.

**BACKGROUND**

In a thirteen-count Superseding Indictment charging Hawkins and twenty-two others with various offenses, Hawkins was charged with one count of conspiring with Alex Luna, the head of a drug organization, Joshua Febres, a Luna associate and the brother of Hawkins's childhood friend, Arcadio Ramirez, Jose Luis Rodriguez and others to possess with intent to distribute and to distribute fifty grams or more of cocaine base and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. In May 2006, Hawkins and two co-defendants, Ramirez and Rodriguez, were tried before a jury on the conspiracy count. Hawkins was found guilty of entering into a conspiracy to distribute less than 500 grams of a mixture or substance containing a detectable amount of cocaine and/or less than five grams of a mixture or substance containing a detectable amount of cocaine base. The jury also convicted Ramirez and Rodriguez, finding them responsible for at least 500 grams and five kilograms of cocaine, respectively.

At trial, the government presented evidence regarding a conspiracy led by Alex Luna to distribute cocaine in Danbury, Connecticut from late 2002 until March 4, 2005, when Luna, his

3

associate Febres, Hawkins and others were arrested. The evidence concerning Hawkins adduced at trial consisted of: (1) recordings of five intercepted telephone calls between Hawkins and members of the conspiracy; (2) the testimony of cooperating witness Febres; and (3) the testimony of Special Agent Eileen Dinnan of the Drug Enforcement Administration. We review this evidence in the light most favorable to the government.

Members of the Luna conspiracy testified that an eight-ball of cocaine, approximately 3.5 grams, could be broken down into several 0.3 gram bags for resale. An eight-ball, however, might also be bought for personal use.

On February 9, 2005, Febres called Hawkins, a childhood friend of his sister. Hawkins confirmed to Febres what it appears he suggested previously to Luna: that Hawkins wanted to purchase five grams of cocaine from Luna. Febres told him the price would be twenty-three dollars per gram. Hawkins asked about the quality of the cocaine, and Febres reassured him that it was "official. Trust." Febres passed the phone to Luna, who told Hawkins, "Come get your shit, man." Hawkins told Luna that he had recently seen Henry Mayoral, a member of the Luna conspiracy. Hawkins then explained to Luna that he expected to sell his car in a few days and planned to put some of the proceeds into savings and use the rest "to get fresh with." Febres testified that this meant Hawkins planned to purchase cocaine from Luna. Hawkins asked Luna how he should get in touch with them and Luna instructed him to use the same number from which Febres had just called him, Luna's cellphone number. Hawkins said he would store the number in his phone and call Luna later. Hawkins and Luna then chatted, with Hawkins expressing his desire to "[s]tay under the radar" and "[s]tay away from them knuckle heads and

4

that wild shit." Hawkins said that he did "nothing but go to work and come home and chill with [his] kids and wifey," who was pregnant. Hawkins then told Luna, "Give me like five or six little, little, little peoples to ride with. You know what I mean? So I could do whatever and uhm . . . ." Febres testified that this sale of five grams to Hawkins did not occur.

On February 12, 2005, Hawkins called Luna and told him that two individuals from work were seeking drugs. "These kids . . . from work, like I got two . . . of them. Homie been calling me. He's . . . looking hard, man." Febres testified that "looking hard" meant the customer wanted to get high. Hawkins noted that he does not do business with the cocaine dealers on Beaver Street. Hawkins asked Luna about buying an eight-ball and they agreed Hawkins would call Luna back later that day. Febres thought Hawkins might have been planning to get high with his customers or to take some for his own use. Special Agent Dinnan conducted surveillance of Luna that day and observed Hawkins meet with Luna in the parking lot of Hawkins's condominium. Febres testified that this sale of 3.5 grams of cocaine to Hawkins was completed.

On February 17, 2005, Luna called Hawkins. Hawkins asked Luna how much he wanted for two eight-balls and Luna confirmed that the price was ninety dollars per eight-ball. The two arranged to meet at a local ice-cream parlor. Febres went with Luna to deliver the cocaine to Hawkins at the parlor. Febres testified that this sale of seven grams of cocaine to Hawkins was completed.

On February 23, 2005, Hawkins called Luna and said that he was broke but he needed an eight-ball. Hawkins explained that he had a potential customer:

> I got this white kid, he waiting for me right now, he got a $100.00.
> I need a "8 ball" though. You know what I mean? I need to come

5

from you right now and go give it to him and then hit you right back in the spot. Whatever or just give you [unintelligible], I'll get back on my feet.

Febres explained that Hawkins was asking Luna for credit to resell an eight-ball to a customer from New Milford. Luna agreed with the plan, saying he would call him back. A few minutes later, Hawkins called Luna and asked for confirmation on the deal. Hawkins again said he would meet the customer, "grab the dough from him and come right back and hit you with it." Luna told Hawkins to "go to the Gardens," a Danbury housing complex, and Luna said he would "be right there." At this time, Luna, Febres and a co-conspirator were inside a parked car, compressing cocaine. (Febres explained that this process entailed cutting the cocaine to decrease its purity.) The credit transaction with Hawkins did not take place.[1]

Febres testified that Hawkins was an addict who bought drugs, and that he was neither a drug dealer generally nor a member of the Luna organization. Febres accepted the government's characterization of Hawkins as a go-between.

At the close of the government's main case, Hawkins and his co-defendants each moved for a judgment of acquittal. The District Court denied the motions, explaining that with respect to Hawkins it "is a closer call[,] but if the jury adopts the government's view of the evidence . . . I think they could return a verdict against Mr. Hawkins."

The District Court charged the jury, instructing that on the element of membership in a conspiracy the government must prove more than mere presence, association, and knowledge.

---

[1] The government suggests it did not take place because Luna was too busy compressing cocaine.

As Hawkins requested, the District Court further instructed: "Thus, without more, the mere existence of the buyer/seller [relationship] is insufficient to establish membership in a conspiracy." The District Court also instructed the jury on single versus multiple conspiracies, explaining that the government must prove the existence of the conspiracy charged in the indictment and each defendant's participation in that conspiracy. The jury found Hawkins guilty, the District Court subsequently granted his Rule 29(c) motion, *Hawkins*, 2007 WL 1732767, and this appeal followed.

**DISCUSSION**

*I. Standard of Review and Proof of Conspiracy*

"We review the district court's judgment of acquittal notwithstanding the verdict *de novo*." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial "bears a heavy burden." *United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007) (internal quotation marks omitted), *cert. denied*, 128 S. Ct. 1320 (2008). On such a challenge, "we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *Id.* (internal quotation marks omitted). We will sustain the jury's verdict "so long as '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 225-26 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In the application of this Rule to the conspiracy conviction challenged here, we note that '[i]n cases of conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is

7

a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (brackets in original) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (ellipsis in original)).  We further note that "our sufficiency of the evidence test must consider the [g]overnment's case in its totality rather than in its parts, and may be satisfied by circumstantial evidence alone." *Id.* (citations omitted).  Nevertheless, "specious inferences are not indulged because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (citation, brackets, and internal quotation marks omitted).  "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted).

"To be guilty of conspiracy, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (internal quotation marks omitted), *cert. denied*, 127 S. Ct. 1022 (2007).  "An individual defendant's membership in a conspiracy may not be established simply by his presence at the scene of a crime, nor by the fact he knows that a crime is being committed." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997), *cert. denied*, 525 U.S. 874 (1998).  Nor is a defendant's "mere association with those implicated in an unlawful undertaking [sufficient] to prove knowing involvement." *United States v. Nusraty*, 867 F.2d 759, 764 (2d

Cir. 1989). "Evidence tending to show knowing participation in the conspiracy is also needed, *i.e.*, facts sufficient to draw a logical and convincing connection between circumstantial evidence of an agreement, and the inference that an agreement was in fact made." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (citation and internal quotation marks omitted); *see also Desimone*, 119 F.3d at 223 ("[M]embership requires proof of purposeful behavior aimed at furthering the goals of the conspiracy."). Nevertheless, "[t]he government need not prove that the defendant[] knew the details of the conspiratorial scheme or the identities of all of the conspirators." *United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002). The defendant's participation in the conspiracy with the requisite criminal intent may be established through circumstantial evidence. *Wexler*, 522 F.3d at 208.

## II. The Buyer-Seller Rule

A conspiracy conviction requires proof "that two or more persons agreed to participate in a joint venture intended to commit an unlawful act." *Desimone*, 119 F.3d at 223. "A transfer of drugs from a seller to a buyer necessarily involves agreement, however brief, on the distribution of a controlled substance from the former to the latter." *Wexler*, 522 F.3d at 210 (Raggi, J., concurring in part and dissenting in part). However, while the illegal sale of narcotics is a substantive crime requiring an agreement by two or more persons, "'the sale agreement itself cannot be the conspiracy [to distribute], for it has no separate criminal object.'" *Wexler*, 522 F.3d at 208 (alteration in original) (quoting *United States v. Thomas*, 284 F.3d 746, 751-52 (7th Cir. 2002)). "Without more, the mere buyer-seller relationship . . . is insufficient to establish a conspiracy." *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998); *see also Wexler*, 522 F.3d at

9

210 (Raggi, J., concurring in part and dissenting in part) ("Absent more, . . . the law does not consider this momentary meeting of the minds sufficient to support a conviction for conspiring to distribute drugs."); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir.) ("[A] mere buyer-seller relationship is not necessarily a conspiracy . . . ."), *cert. denied*, 493 U.S. 933 (1989); *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964) ("[A] sale or a purchase scarcely constitutes a sufficient basis for inferring agreement to cooperate with the opposite parties for whatever period they continue to deal in this type of contraband, unless some such understanding is evidenced by other conduct which accompanies or supplements the transaction."), *cert. denied*, 379 U.S. 960 (1965); *United States v. Koch*, 113 F.2d 982, 983 (2d Cir. 1940) ("The purchase of the cocaine from [a conspirator] was not enough to prove a conspiracy in which [the seller] and the appellant participated. They had no agreement to advance any joint interest.").

"The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy." *United States v. Medina*, 944 F.2d 60, 65 (2d Cir. 1991), *cert. denied*, 503 U.S. 949 (1992). However, "[t]his rationale does not apply . . . where, [for example,] there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use. Under such circumstances, the participants in the transaction may be presumed to know that they are part of a broader conspiracy." *Id.* at 65-66.

It is clear, then, that the existence of a buyer-seller relationship does not *itself* establish a

10

conspiracy; however, where there is additional evidence showing an agreement to join together to accomplish an objective beyond the sale transaction, the evidence may support a finding that the parties intentionally participated in a conspiracy. *See Wexler*, 522 F.3d at 208 (noting, in the course of reversing conviction for narcotics-distribution conspiracy, the absence of proof of an agreement to distribute); *Gore*, 154 F.3d at 41 (holding that "it would be sheer speculation for jurors to conclude that an agreement to distribute drugs had been made" where there was no evidence "of the exact nature of [the sale] transaction or the quantity of drugs involved"); *Beech-Nut Nutrition Corp.*, 871 F.2d at 1191 ("[A] defendant may be deemed to have agreed to join a conspiracy if there is something more, some indication that the defendant knew of and intended to further the illegal venture, that he somehow encouraged the illegal use of the goods or had a stake in such use." (internal quotation marks omitted)); *Borelli*, 336 F.2d at 384 ("Purchase or sale of contraband may, of course, warrant the inference of an agreement going well beyond the particular transaction. A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods over an uncertain period of time, and the circumstances may also warrant the inference that a supplier or a purchaser indicated a willingness to repeat."); *Koch*, 113 F.2d at 983 ("It was necessary to the government's case to show that the appellant was in some way knowingly associated in the unlawful common enterprise to import the drugs and dispose of them unlawfully.").

Thus, where the evidence has supported the inference that a defendant agreed to participate in the conspiracy beyond simply buying or selling we have upheld the conviction. For example, in *United States v. Miranda-Ortiz*, 926 F.2d 172 (2d Cir.), *cert. denied*, 502 U.S. 928

11

(1991), we rejected a sufficiency challenge brought by a defendant whose participation was limited to "a single transaction" because "the evidence permit[ted] an inference that the defendant had knowledge of the conspiracy and intended to join." *Id.* at 176. In that case, there was evidence that the defendant had twice offered to sell narcotics to an alleged coconspirator and that "the two men exchanged beeper numbers." *Id.* Although the defendant argued that this evidence suggested he "was merely offering to supply [the buyer] for his personal use," we found that the jury could infer from the exchange of beeper numbers that the defendant suspected the buyer "was likely a distributor, rather than one who purchased only for his own personal use," and that he had "sought to become [the buyer's] partner in an ongoing narcotics operation." *Id.* The evidence surrounding an actual transaction further established that the two men had conspired together to distribute cocaine. The coconspirator, unable to obtain cocaine for a repeat customer from his normal supplier, sought to buy a kilogram of cocaine from the defendant. *Id.* The defendant, certainly aware by now that this buyer was a distributor, sought reassurances that the repeat customer was reliable. On that record, we held that the evidence "easily" satisfied the element of participation and "was ample to permit the jury to infer beyond a reasonable doubt that [he] knew of the ongoing conspiracy and joined it." *Id.*

Similarly, in *Medina*, we held that the district court had not erred in refusing to give a buyer-seller instruction to the jury because of the evidence of "advanced planning . . . to deal in wholesale quantities of drugs obviously not intended for personal use." 944 F.2d at 65. Such evidence permits an inference that defendants are "part of a broader conspiracy." *Id.* at 65-66.

On the other hand, in *Gore*, we held that a heroin seller's statement that he did not "want

12

to lose face with" his supplier established a buyer-seller relationship between the two, but was "standing alone . . . legally insufficient to show a conspiratorial agreement to distribute drugs made between [the defendant] and that unknown source." 154 F.3d at 40. We acknowledged that the defendant's statement "may imply more than one transaction," but we held that "it would be sheer speculation for jurors to conclude that an agreement to distribute drugs had been made" in the absence of any "specific indication of the exact nature of that transaction or the quantity of drugs involved." *Id.* at 41.

Most recently, in *Wexler*, we held that there was insufficient evidence to support the defendant's conviction for conspiring to distribute the painkiller Dilaudid, resulting in the death of an alleged co-conspirator, because, although there was evidence that the two conspired to distribute *other* painkillers to third parties, there was no evidence that the Dilaudid the defendant helped supply "was redistributed or that there was ever any agreement or intention on the parts of [the two individuals] to do so." 522 F.3d at 208. We also noted that the quantities of Dilaudid received "were consistent with personal use." *Id.* The indictment specifically charged "that the part and object of the conspiracy resulting in death was one to distribute Dilaudid, not a 'variety of drugs.'" *Id.* at 209. Thus, in the absence of "proof that [the recipient] agreed to, or did, distribute Dilaudid, [the two individuals] were mere buyer-and-seller with respect to Dilaudid." *Id.* at 208.

The critical inquiry in each case is whether the evidence in its totality suffices to permit a jury to find beyond a reasonable doubt that the defendant was not merely a buyer or seller of narcotics, but rather that the defendant knowingly and intentionally participated in the narcotics-

13

distribution conspiracy by agreeing to accomplish its illegal objective beyond the mere purchase or sale.

Evidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined the seller's distribution conspiracy. This is so even if the seller is aware of the buyer's intent to resell. It is axiomatic that more is required than mere knowledge of the purpose of a conspiracy. *See, e.g.*, *Direct Sales Co. v. United States*, 319 U.S. 703, 711-13 (1943); *United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003). Such knowledge alone would not establish aiding and abetting liability, which requires proof of the intent to contribute to the success of the underlying crime, *see United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006), let alone conspiracy. *See United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir.) (en banc) ("A person who sells a gun knowing that the buyer intends to murder someone may or may not be an aider or abettor of the murder, but he is not a conspirator, because he and his buyer do not have an agreement to murder anyone."), *cert. denied*, 510 U.S. 982 (1993); *United States v. Tyler*, 758 F.2d 66, 70-71 (2d Cir. 1985) (reversing conviction for conspiracy to distribute heroin of defendant who helped willing buyer find willing seller, but affirming his conviction for aiding and abetting heroin distribution). Circumstantial evidence may, however, support taking "[t]he step from knowledge to intent and agreement," provided that "the evidence of knowledge [is] clear, not equivocal." *Direct Sales*, 319 U.S. at 711, 713; *accord Ceballos*, 340 F.3d at 124.

While we have avoided listing factors to guide what is a highly fact-specific inquiry into whether the circumstances surrounding a buyer-seller relationship establish an agreement to

14

participate in a distribution conspiracy, our sister circuits have identified several, including "whether there was prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit ('fronting'), and the quantity of drugs involved." *United States v. Hicks*, 368 F.3d 801, 805 (7th Cir. 2004); *United States v. Gibbs*, 190 F.3d 188, 199 (3d Cir. 1999) (discussing several factors, including "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and whether there is a demonstrated level of mutual trust"; "whether the buyer's transactions involved large amounts of drugs"; and "[w]hether the buyer purchased his drugs on credit"), *cert. denied*, 528 U.S. 1131 (2000). The relevance of similar factors has also been noted in our Circuit. *See United States v. Wexler*, 522 F.3d 194, 211 (2d Cir. 2008) (Raggi, J., concurring in part and dissenting in part). No single factor is dispositive. *See Hicks*, 368 F.3d at 805; *Gibbs*, 190 F.3d at 200. The dispositive inquiry remains whether a rational jury could find beyond a reasonable doubt that a defendant has agreed to join and participate in the conspiracy.

### III. Evidence in this Case

In this case, the parties do not dispute that the government adequately proved that the Luna conspiracy existed; that Hawkins knew of the Luna conspiracy; that Hawkins purchased cocaine from Luna; that Hawkins intended to resell at least some of the cocaine he purchased from Luna; and that Luna and Febres knew that Hawkins intended to resell some of the purchased cocaine. *See United States v. Hawkins*, No. 05-cr-058, 2007 WL 1732767, at *3-4 (D. Conn. June 15, 2007) (finding sufficient evidence of a Luna conspiracy, Hawkins's knowledge

15

thereof, and awareness by some Luna co-conspirators that Hawkins intended to resell cocaine). Hawkins does dispute, however, that he joined the conspiracy. He argues that he purchased the cocaine to use it, share it, or sell it, but it was only his business what he would do with it. The sole question, therefore, is whether the evidence was sufficient to permit a reasonable jury to find beyond a reasonable doubt that Hawkins intentionally joined and participated in the Luna conspiracy.

In granting Hawkins's motion, the District Court concluded that the evidence establishes at most that Hawkins acted as a "go-between," i.e., one who facilitates sales between suppliers and users, without the intent "to further the goals of the conspiracy." *Id.* at *7. The District Court held that the government proved "that it [wa]s plausible that Hawkins joined the conspiracy, but not that he joined the charged conspiracy beyond a reasonable doubt." *Id.* at *9.

We find that the evidence was sufficient to support the jury's finding beyond a reasonable doubt that Hawkins knowingly and intentionally joined and participated in the Luna conspiracy. After reviewing the evidence against Hawkins in its totality and in the light most favorable to the government, we find that a rational jury could have found beyond a reasonable doubt that Hawkins intentionally joined the Luna conspiracy by entering into a distribution agreement with Luna himself that afforded Hawkins a source of cocaine and Luna another outlet — albeit small — for his contraband.

In sum and as discussed further below, the evidence clearly establishes that Hawkins intended to redistribute some of the cocaine he purchased or sought to purchase from Luna and, moreover, that Luna and his associates knew this. In addition, the evidence supports the

16

inference that Hawkins was not freelancing in this respect but that Hawkins agreed to engage in this conduct with Luna on an ongoing basis and that Hawkins and Luna trusted each other to work together as supplier and street-level dealer. Hawkins purchased or sought to purchase from Luna on several occasions within a short time frame. Hawkins repeatedly brought potential customers' needs to Luna's attention and then made arrangements with Luna to obtain cocaine for resale, using the cellphone number which Luna had disclosed to him and he had stored on his phone for future use. The mutual trust between Hawkins and Luna was further demonstrated by Hawkins's express preference of Luna over other local dealers and Luna's agreement, at least initially, to extend credit to Hawkins.

First, the tape recordings provide direct proof of Hawkins's intent to redistribute the cocaine he purchased or sought to purchase from Luna and Luna's awareness of the same. On February 12, 2005, Hawkins purchased an eight-ball with the express intent of redistributing it to his co-workers, while perhaps reserving some for himself. There is no direct evidence regarding Hawkins's intent with respect to the two eight-balls he purchased five days later. But on February 23, 2005, Hawkins again expressed his intent to redistribute an eight-ball to another customer. Even if Hawkins's goal was to buy from Luna for his own use in addition to sharing it with these customers, he nevertheless displayed an intent to redistribute Luna's cocaine. As we recently held, and as the District Court instructed the jury, "one who delivers or transfers narcotics to another — for consideration or gratis — is distributing," and so even "the social sharing of a small quantity of drugs, without consideration, constitutes the distribution of drugs within the meaning of 21 U.S.C. § 841(a)." *United States v. Wallace*, 532 F.3d 126, 129 (2d Cir.

17

2008) (holding that defendant's testimony that he shared with friends "is direct evidence that [he] engaged in the distribution of cocaine base").  The evidence in this case clearly demonstrates that Hawkins intended to redistribute cocaine and made this known to Luna.  This supports the jury's finding that Hawkins agreed to further the objectives of the Luna conspiracy beyond his mere agreement to buy cocaine.

Second, additional evidence taken together supports the step from this clearly established joint knowledge to proof beyond a reasonable doubt that Hawkins was not just a Luna customer who happened to intend to redistribute cocaine independently, but that he agreed to join and participate in the Luna conspiracy.  Hawkins purchased or sought to purchase cocaine from Luna four times within two weeks.  *See United States v. Contreras*, 249 F.3d 595, 600 (7th Cir.) (noting that repeat sales suggest "more than a transient relationship," but are "by themselves" insufficient to support an inference of a conspiracy between the supplier and purchaser), *cert. denied*, 534 U.S. 914 (2001).  On two occasions, Hawkins expressly contacted Luna because he had identified potential customers.  *See United States v. Mims*, 92 F.3d 461, 463, 465 (7th Cir. 1996) (noting that "purchase of narcotics for resale is *evidence* of a conspiratorial agreement[,] especially when the purchases are repeated").  Hawkins did so by calling Luna's cellphone number, which he had programmed into his phone in order to contact Luna more readily in the future.  *See United States v. Thompson*, 528 F.3d 110, 118 (2d Cir. 2008) (per curiam) (noting, in the course of rejecting a sufficiency challenge to a narcotics distribution conspiracy conviction, that a defendant's "cell phone directory contained the telephone numbers of the other members of the conspiracy"); *cf. Tyler*, 758 F.2d at 68-69 (noting, in the course of reversing the conspiracy

18

conviction of a mere go-between, the absence of evidence that the defendant "knew where to find [the supplier] or expected him to be in the area").

Third, there was evidence reflecting mutual trust between Hawkins and Luna. Hawkins explained to Luna that he wanted to be supplied by him instead of alternative sources on Beaver Street. As noted, Luna disclosed his cellphone number to Hawkins. Moreover, Luna indicated his willingness to supply Hawkins with cocaine on credit. *See Gibbs*, 190 F.3d at 200 ("A credit relationship may well reflect [mutual trust], and often evidences the parties' mutual stake in each other's transactions."). Luna's expressed willingness to provide Hawkins with approximately $100 worth of cocaine on credit reflects trust in Hawkins and a stake in his redistribution, even if an agreement to extend a greater amount of credit for a longer or less definite amount of time would have reflected an even more intimate relationship. That Luna and his colleagues might have been too busy compressing cocaine to consummate this credit transaction with Hawkins does not negate the inference of trust and shared interest. The jury could reasonably infer that Luna would have simply rejected Hawkins's proposal out of hand had he not trusted Hawkins or cared about his redistribution. This evidence in its totality suffices to permit a rational jury to find beyond a reasonable doubt that Hawkins intentionally joined the Luna conspiracy.

The absence of prolonged cooperation in this case does not compel a different result. Hawkins was arrested in early March, just nine days after the evidence of his last attempted purchase from Luna. There is no rule prohibiting a conspiracy conviction based on sufficient evidence that a defendant joined the conspiracy only shortly before the government dismantled it.

In addition, the relatively small quantity of cocaine at issue does not render the evidence

19

insufficient. Despite conceding that the jury could have found that he "intended to resell some of the drugs he purchased from Luna," Hawkins argues that the amount of cocaine he purchased "supports his claim that he was a user rather than a dealer." In some cases, a large drug quantity may, in addition to establishing an intent to redistribute, support inferences about the relationship between the participants. "A large transaction or an accumulation of deals suggests more trust, garnered over a period of time, as well as a greater likelihood that the parties have 'put their heads together' to figure out planning, organization, and ways to conceal their activities." *Gibbs*, 190 F.3d at 199. The drug quantities in this case are, to be sure, extremely small and, in the absence of other evidence, consistent with mere personal use. Unlike the two to three kilograms of cocaine at issue in *United States v. Medina*, 944 F.2d 60, 65 (2d Cir. 1991), the eight-balls here are not so large as to be "obviously" "destined for resale." Luna conspirators testified, however, that even eight-balls might be broken down for resale into several 0.3 gram bags. This evidence is consistent with a finding that Hawkins intended to redistribute the cocaine, although by itself it does not establish that intent beyond a reasonable doubt. In any event, the tape recordings provide sufficient proof of joint knowledge of Hawkins's intent to redistribute Luna's cocaine.

Although Hawkins's dealings with Luna were not standardized, the presence of some transaction costs also does not preclude a finding of conspiracy. *Cf. United States v. Hach*, 162 F.3d 937, 943-44 (7th Cir. 1998) (rejecting a sufficiency challenge in part because "the evidence shows a pattern of routine transactions rather than individualized ones," in contrast to evidence of high transaction costs, which would "counsel against a finding of conspiracy" (internal

20

quotation marks omitted)), *cert. denied*, 526 U.S. 1103 (1999).  Hawkins, Luna, and Febres discussed purchases, chatted about personal matters, and made arrangements to meet.  The extent of such interactions in this case does not seem out of the ordinary for any business venture, especially an illegal one.  We cannot say that any transaction costs borne by Hawkins and Luna were so high as to create a reasonable doubt where, as here, the jury was instructed that a mere buyer-seller relationship was insufficient and the evidence supports a finding that Hawkins was not only a customer but a knowing and willing participant in Luna's distribution of cocaine.

Hawkins's argument that he was at most merely a "go-between" also fails.  We have held that, "standing alone," evidence that a defendant "helped a willing buyer locate a willing seller . . . is insufficient to establish the existence of an agreement between the facilitator and the seller." *United States v. Tyler*, 758 F.2d 66, 69 (2d Cir. 1985).  As discussed, in this case the evidence that Hawkins acted as a "go-between" does not stand alone but rather is accompanied by additional evidence from which the jury could reasonably infer, and not merely speculate, that Hawkins agreed to carry out the objectives of the Luna conspiracy.  *See United States v. Desimone*, 119 F.3d 217, 224 (2d Cir. 1997).  In addition, the jury was free to disregard Febres's conclusory testimony that Hawkins was only a go-between and was not a member of the Luna conspiracy and to conclude instead, based on Febres's account of Hawkins's actual conduct, that Hawkins joined the conspiracy.

The evidence in this case was sufficient for a jury to find beyond a reasonable doubt that Hawkins and Luna were not merely buyer and seller and, specifically, that Hawkins knowingly and intentionally joined in Luna's conspiracy to distribute cocaine.  Although the scope of

21

Hawkins's participation in the conspiracy might not have been especially significant, the evidence was sufficient to establish his intentional participation in the charged conspiracy beyond a reasonable doubt.

## CONCLUSION

For the foregoing reasons, we REVERSE the judgment of acquittal and REMAND this case to the District Court for further proceedings consistent with this opinion.