**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: December 8, 2008                    Decided: February 3, 2009)

Docket No. 07-0620-cr(L), 07-1217-cr(con), 07-1457-cr(con), 07-1464-cr(con), 07-1650-cr(con), 07-5672-cr(con)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

*Appellee*,

v.

DAVID PARKER, also known as Big D *and* ROBERT JACKSON,

*Defendants*,

KEVIN BRYAN, also known as B (10), KELVIN MINOTT, GEORGE FULLER, also known as Shawn Fuller, JONATHAN BAKER, also known as JB *and* EUGENE BROOKS,

*Defendants - Appellants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:   FEINBERG, LEVAL, and CABRANES,

*Circuit Judges*.

Appeal by defendants Kelvin Minott, George Fuller, and Jonathan Baker from their convictions following a jury trial in the United States District Court for the Northern District of New York (Hurd, *J.*) for conspiracy to possess crack cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841 & 846. Appellants contend that because their relationship to the other conspirators was as buyers to whom the others sold, they cannot be liable for conspiring with their sellers to distribute the drugs. Even if buyers and sellers are not universally liable for conspiracy to make the transfer from seller to buyer, they may be liable for conspiracy together with regard to other transfers of either the seller or the buyer. The Court of Appeals (Leval, *J.*) rejects the claim and affirms the convictions. The court remands Fuller's case for reconsideration of sentence in light of *Kimbrough v. United States*, 128 S. Ct. 558 (2007).

BRENDA K. SANNES, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney, *on the brief*, Lisa M. Fletcher, Assistant United States Attorney, *of counsel*), United States Attorney's Office for the Northern District of New York, Syracuse, New York for *Appellees*.

CATHERINE E. STUCKART, Binghamton, New York for *Defendant-Appellant Kelvin Minott*.

CHARLES F. WILSON, Nevins & Nevins LLP, East Hartford, Connecticut for *Defendant-Appellant Jonathan Baker*.

Vivian Shevitz, South Salem, New York for *Defendant-Appellant George Fuller*

LEVAL, *Circuit Judge*:

Defendants Kelvin Minott, George Fuller, and Jonathan Baker[1] appeal from their

_____

[1]Appellant Eugene Brooks also appealed his conviction, but his appeal was dismissed as barred by his waiver of right to appeal contained in his plea agreement. *See United States v.*

2

convictions after jury trial in the United States District Court for the Northern District of New York (Hurd, *J.*). They were convicted of conspiracy to possess crack cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841 and 846. The appellants contend that the evidence was legally insufficient to support their convictions relying on the so-called "buyer-seller" exception. The appellants contend that as buyers of drugs from a selling conspiracy, they could not be convicted of conspiring with the sellers for the illegal transfer of the drugs. We reject the contention and affirm the convictions. The appellants' argument is based on an oversimplified misunderstanding of the buyer-seller exception. Even if the buyer-seller exception protects buyers from criminal liability for conspiracy with their sellers to make the transfer between them, it does not protect them from criminal liability for conspiracy with their sellers with regard to other transfers either by the seller or by the buyers, if the facts support such a charge. We remand Fuller's case for the district court to reconsider his sentence in light of *Kimbrough v. United States*, 128 S. Ct. 558 (2007).

## BACKGROUND

The evidence, seen in the light most favorable to the government, *see Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), showed the following: A drug distribution organization located in the Utica, New York area sold crack cocaine to numerous customers, at the rate of approximately

---

*Parker*, No. 07-1650-cr(con) (2d Cir. Sept. 19, 2008). Appellant Kevin Bryan's appeal was dismissed without prejudice to refile, without objection. *See United States v. Parker*, No. 07-0620-cr(L) (2d Cir. June 2, 2008).

3

one kilogram per week. Members of this organization included Sandra Willis, the organization's principal recruiter, "Carmen," "Bujo," "Jamaican Mike," "Shortman," "Dizzy," and later, Mark Ramsey. The group sold crack cocaine to customers who would call drug-order phone lines. Beginning in 2003, Dizzy and Bujo, whom Willis brought into the organization and trained to sell crack cocaine, operated one of the drug-order phone lines out of a second floor apartment on Taylor Avenue, which customers referred to as either "T," "Taylor," or "T Block." The selling group sold crack cocaine in amounts ranging from a minimum of an "eightball," consisting of 3.5 grams, to multiple ounces. An eightball was typically divided into "tens" (0.1 gram packages for $10), "twenties" (0.2 gram packages for $20), or "fifties" (0.5 gram packages for $50) for resale.

Pursuant to court-authorized wiretaps, the appellants Fuller, Minott, and Baker were recorded numerous times calling the drug order phone line arranging to buy crack cocaine. Members of the selling organization testified that they sold frequently to Fuller, Minott, and Baker, whom they had never known to use crack cocaine themselves. However, members of the selling group, including Willis, Dizzy, Bujo, and Ramsey, knew that the appellants engaged in resale of the crack cocaine they purchased.

The appellant Minott purchased crack cocaine in large quantities from at least seven different members of the selling group. In 2005, he bought approximately an ounce of crack cocaine each week from Dizzy. He also ordered eightballs from both Dizzy and Bujo over the drug order phone line using coded terms such as "Guinness" and "Heineken" to refer to various

types of drugs. Willis testified that Minott purchased crack from her, on and off, for three years, in quantities of between one and four eightballs. Willis knew that Minott resold the crack he bought.

In addition to purchasing crack cocaine from members of the Taylor Avenue selling group, Minott introduced associates to the group. In the summer of 2002, Minott introduced his roommate, Mark Ramsey, to the selling group. Initially, Ramsey and Minott jointly purchased about an eightball of crack per week from Dizzy, which they subdivided and sold. Carmen and Shortman eventually induced Ramsey to operate one of the drug-order phone lines, and Minott began to make drug deliveries for the selling group. Minott made at least two deliveries for Ramsey, and told him that he would be willing to make more deliveries. In another instance, Minott used an intermediary named Pops to distribute crack. In the summer of 2005, Minott introduced Pops to Dizzy, and later complained to Dizzy when Pops began purchasing crack directly from Dizzy behind Minott's back.

The appellant Fuller had a relationship with Dizzy, Willis, and others in the organization for several years, over which time he bought crack cocaine on numerous occasions. Fuller was frequently at the Taylor Avenue crack house, and was considered by Willis to be a "constant" customer, buying anywhere between one to four eightballs at a time. In July 2005, Fuller bought crack from Mark Ramsey. During this period, Fuller purchased at least an eightball of crack cocaine every day. Willis and Ramsey each provided crack on credit to Fuller on at least one

occasion.

Willis knew that Fuller sold crack out of a house at 721 Lansing Street, and would occasionally deliver crack to Fuller there. Fuller also told Willis that he had customers outside Utica, in Watertown. Likewise, Ramsey knew that Fuller distributed the crack Ramsey sold him. Fuller complained to Ramsey that his customers were dissatisfied with the crack he had gotten from Ramsey, and that he had lost customers while waiting for Ramsey to make a delivery. One customer testified that he purchased crack in "twenties" from Fuller at the Taylor Avenue crack house (and ultimately at the Lansing Street house, as well) because the Taylor Avenue selling group would not sell crack in quantities smaller than an eightball.

The appellant Baker purchased eighteen eightballs of crack cocaine from Dizzy and Bujo through the drug-order phone line during an eighteen-day period in 2005. Often Baker would meet Dizzy or Bujo at the Taylor Avenue crack house to collect the drugs. On one day, July 1, 2005, Baker bought five eightballs of crack cocaine from Bujo and was prevented from making a sixth purchase only because operations had closed for the night.

Trial began on October 10, 2006, and lasted six days. The jury convicted appellants on all charges with one minor exception.[2] Each was sentenced principally to 240 months imprisonment. These appeals followed.

**DISCUSSION**

---

[2]The jury acquitted Baker of possessing crack cocaine with intent to distribute on June 23, 2005, which was charged in Count 17 of the indictment.

## I. Buyer-Seller Exception

Appellants contend that the evidence was insufficient to show that they had joined a conspiracy to distribute crack cocaine. They argue that their transactions were nothing more than purchases, which, under the so-called "buyer-seller exception" developed in this Circuit's case law, do not suffice to prove a conspiracy for the transfer of illegal drugs. Their argument overstates the scope of the exception.

The essence of conspiracy is agreement among two or more persons to join in a concerted effort to accomplish an illegal purpose. *United States v. Bayer*, 331 U.S. 532, 542 (1947). To prove a conspiracy, the evidence must show that "two or more persons agreed to participate in a joint venture intended to commit an unlawful act." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997). To be a member of a conspiracy one must, under Judge Learned Hand's classic formulation, "in some sense promote [the illegal] venture himself, make it his own, have a stake in its outcome." *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940) (L. Hand, J.), *aff'd* 311 U.S. 205 (1940); *see also United States v. Beech-Nut Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989) ("[A] defendant may be deemed to have agreed to join a conspiracy if there is something more, some indication that the defendant knew of and intended to further the illegal ventures, that he somehow encouraged the illegal use of goods or had a stake in such use." (internal quotation marks omitted)); *United States v. Borelli*, 336 F.2d 376, 385 (2d Cir. 1964). Accordingly, unless at least two persons have a *shared* purpose or stake in the promotion of an

illegal objective, there is no conspiracy.

As a literal matter, when a buyer purchases illegal drugs from a seller, two persons have agreed to a concerted effort to achieve the unlawful transfer of the drugs from the seller to the buyer. According to the customary definition, that would constitute a conspiracy with the alleged objective of a transfer of drugs. Our case law, however, has carved out a narrow exception to the general conspiracy rule for such transactions. *See, e.g.*, *United States v. Hawkins*, 547 F.3d 66, 71-72 (2d Cir. 2008) (citing several cases from our Circuit to the effect that a simple drug transaction is not sufficient, by itself, to support a conspiracy conviction); *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998) (observing that "[w]ithout more, the mere buyer-seller relationship . . . is insufficient to establish a conspiracy"). Under this rule, notwithstanding that a seller and a buyer agree together that they will cooperate to accomplish an illegal transfer of drugs, the objective to transfer the drugs from the seller to the buyer cannot serve as the basis for a charge of conspiracy to transfer drugs.

This exception from the customary standards of conspiracy preserves important priorities and distinctions of the federal narcotics laws, which would otherwise be obliterated. The federal scheme of prohibition of controlled substances distinguishes importantly between, on the one hand, distribution of a controlled substance, which is heavily punished, and, on the other, possession or acquisition of a controlled substance, which is punished far less severely, if at all. *Compare* 21 U.S.C. § 841 (listing punishments for the distribution of controlled substances) *with*

8

*id.* § 844 (listing punishments for simple possession of controlled substances). (No doubt, considerations underlying this distinction include a policy judgment that persons who acquire or possess illegal drugs for their own consumption because they are addicted are less reprehensible and should not be punished with the severity directed against those who distribute drugs, as well as the perception that distribution of drugs has "a substantial and detrimental effect on the health and general welfare of the American people." *Id.* § 801(2).) At the same time, inchoate offenses, such as conspiracy and attempt are generally punished in the same manner and with the same severity as the completed offense. *See id.* § 846 ("Any person who attempts or conspires to commit an offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense."). Therefore, if an addicted purchaser, who acquired drugs for his own use and without intent to distribute it to others, were deemed to have joined in a conspiracy with his seller for the illegal transfer of the drugs from the seller to himself, the purchaser would be guilty of substantially the same crime, and liable for the same punishment, as the seller. The policy to distinguish between transfer of an illegal drug and the acquisition or possession of the drug would be frustrated. The buyer-seller exception thus protects a buyer or transferee from the severe liabilities intended only for transferors.

In more abstract theoretical terms, it is also observed that, as a purchase or transfer necessarily involves the cooperation of both the transferor and the transferee, but for the exception, all transfers would be punishable as conspiracies to transfer, and the separate prohibition of transfers would be redundant and superfluous. It is sometimes said that the

9

buyer's agreement to buy from the seller and the seller's agreement to sell to the buyer cannot "be the conspiracy to distribute, for it has no separate criminal object." *United States v. Wexler*, 522 F.3d 194, 208 (2d Cir. 2008) (internal alterations omitted).[3]

While providing that the unlawful transfer from seller to buyer cannot serve as the basis for a charge that the seller and buyer conspired with one another to make the illegal transfer from seller to buyer, the rule does not protect either the seller or buyer from a charge they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer. *See Wexler*, 522 F.3d at 211 (Raggi, *J.*, concurring in part and dissenting in part) (noting that we have limited the "application of the buyer-seller rule to circumstances where the indictment charges or the proof shows *no more* than a sale transaction" (internal quotations and citations omitted)). Thus, if the evidence supports a finding that the purchaser not only purchased drugs, but in doing so also "in some sense promote[d] the [seller's drug distribution] venture" and "intended to further" it, as described in *Falcone*, 109 F.2d at 581, and *Beech-Nut*, 871 F.2d at 1191, the seller and buyer may be found to be in a conspiratorial agreement to further the seller's other sales. And if the evidence supports a finding that the seller shared with the buyer an interest in furthering resale by the buyer, the seller and buyer may be found to be in a conspiratorial agreement to further the

---

[3] The buyer-seller exception would probably be better named the "transferor-transferee" exception. Presumably it applies to an unpaid transfer in the same manner as to a paid sale, as all the reasons for the exception are equally applicable regardless of whether the transferee pays for the drugs.

buyer's resales.

With regard to a seller's conspiratorial liability for resales by the buyer, it is often said that mere awareness on the part of the seller that the buyer intends to resell the drugs is not sufficient to show that the seller and the buyer share a conspiratorial intent to further the buyer's resale. *See Hawkins*, 547 F.3d at 73-74. This is because the seller cannot be considered to have joined a conspiracy with the buyer to advance the buyer's resale unless the seller has somehow encouraged the venture or has a stake in it – an interest in bringing about its success. *See Falcone*, 109 F.2d at 581. The transferor's mere knowledge of the transferee's intent to retransfer to others, without anything more, would not show that the transferor had a stake or interest in the further transfer of the drugs. Under some circumstances, a seller of drugs may have no interest whatever in whether the buyer uses the drugs himself or resells. Consider, for example, a case in which the original possessor of the drugs holds them for his own use. A friend asks this person to let him have some of his drugs. The possessor agrees, and they effectuate a transfer, either as a gift or at the price the original possessor paid for the drugs. The original owner has become a transferor, his friend a transferee. Under this scenario, however, the transferor has transferred without profit motivation and without intending that the transferee sell or give them to anyone else. So far as the evidence shows, the transferor is indifferent to whether the transferee intends to use the drugs himself, share them with friends, or resell them. On such facts, even assuming the transferee has told the transferor that he intends to sell or give the drugs to a third person, the two are not guilty of conspiracy because the transferor is genuinely

11

indifferent to the possibility of retransfer. There is no *shared* intention between the transferor and the transferee that further transfers occur. Referring to Judge Hand's terminology in *Falcone*, the transferor in this scenario is not in any sense "promot[ing]" further distribution, or "mak[ing] it his own"; he has no "stake" in any further transfers by the transferee. *See also Hawkins*, 547 F.3d at 74 ("It is axiomatic that more is required [to establish liability for conspiracy] than mere knowledge.").

On the other hand, if we consider a hypothetical seller who is running a profit-motivated business of selling drugs in wholesale amounts, this seller may well realize that his buyers' ability to buy and pay for substantial amounts of drugs, and hence, his profit, will depend on the buyers' ability to resell. The business of selling wholesale quantities depends on the ability of the customers to resell. A seller in such circumstances may well share with the buyer an intention that the buyer succeed in reselling and may be seen as having a stake in the buyer's resale. In such case, the liability of buyer and seller for having conspired together to transfer drugs would depend not on the seller's mere knowledge of the buyer's intent to retransfer, but on a further showing of the seller's interest, shared with the buyer, in the success of the buyer's resale.

In the recent case of *United States v. Hawkins*, No. 3:05cr58 (SRU), 2007 WL 1732767 (D. Conn. June 15, 2007), the district court failed to appreciate how limited is the application of the buyer-seller exception. *See Hawkins*, 547 F.3d 66. In that case, the defendant Hawkins was charged with conspiring with members of Alex Luna's drug distribution organization for the

12

possession of cocaine and cocaine base with intent to distribute. The evidence showed that on several occasions Hawkins called members of the Luna organization to negotiate a purchase of one or two "eight-balls." *Id.* at 69. Evidence was received to the effect that an eight ball (3.5 grams) is an amount sufficiently large that it is suitable to be broken down into several 0.3 gram bags for resale (while it is also small enough that it "might also be bought for personal use"). *Id.* at 68. Luna gave Hawkins his cell phone number to be used for drug buys. *Id.* at 69. Hawkins told Luna he was dissatisfied with other competing sellers and preferred working with Luna. In one of Hawkins's calls, he told Luna that the eightball he was buying was, at least in part, for two "kids from work." One of them "had been calling" Hawkins because he "wanted to get high." *Id.* On another occasion, Hawkins called Luna and said that he needed an eightball for a customer who was "waiting for [Hawkins] right now." *Id.* Hawkins explained to Luna that while he had no money to pay for the drugs, the customer had $100, so that, if Luna gave Hawkins the drugs on credit, Hawkins could return with the money immediately after receiving payment from his customer. Luna agreed to give Hawkins the eightball on credit, and told Hawkins to go meet Luna's associates at a housing project to get the drugs. The transaction, however, was not consummated. *Id.* at 69-70.

The jury, which had been instructed that "the mere existence of a buyer-seller [relationship] is insufficient," found the defendant guilty. *Id.* at 70. The district court, however, set aside the conviction, concluding that the evidence was insufficient to support the conspiracy charge. It concluded that there had been no adequate showing of a conspiracy between Luna and

13

Hawkins for Hawkins to possess with shared intent to further distribute. *Hawkins*, 2007 WL 1732767, at *8-9.

We reversed and reinstated the conviction. After reviewing numerous opinions in this Circuit discussing the buyer-seller rule to the effect that a purchase and sale do not constitute a conspiracy unless there is "additional evidence showing an agreement to join together to accomplish an objective beyond the sale transaction," *Hawkins*, 547 F.3d at 72, and acknowledging that the seller's knowledge of the buyer's intent to resell is, without more, not sufficient, we went on to point out various aspects of the evidence which supported a conclusion that the relationship between Luna and Hawkins was not merely that of seller and buyer but that they shared the illegal objective of furthering drug transfers other than the transfer between them. Our opinion pointed to evidence that Hawkins did more than merely purchase from Luna's drug selling conspiracy. He "agreed to further the objectives of the Luna conspiracy," *id.* at 76, effectively seeking to associate himself with the Luna distribution conspiracy in order to secure for himself repeated access to it as a source of drugs and to expand the scope of Luna's distribution venture by repeatedly contacting Luna's organization when he identified potential new customers and establishing a relationship of mutual trust with Luna. We pointed also to evidence that Luna, the seller, joined and associated himself with Hawkins's objective of further distribution of the drugs Luna had sold to Hawkins. As an example, Luna "indicated his willingness to supply Hawkins with cocaine on credit." In so doing, Luna exhibited "trust in Hawkins and a stake in his redistribution." *Id.* We observed, "[t]he jury could reasonably infer

14

that Luna would have simply rejected Hawkins's proposal [to purchase on credit] out of hand had he not . . . cared about [Hawkins's] redistribution." *Id.* For these reasons the evidence was sufficient to show that the defendant Hawkins and the seller Luna shared a conspiratorial intention to advance sales other than the sales from Luna to Hawkins.

The present case has much in common with *Hawkins*. In both cases, the evidence established the existence, prior to the appellants' entry on the scene, of a drug-selling organization. The appellants in both cases made purchases of drugs from that preexisting organization, with intention, known to the sellers, to resell the purchased drugs. The appellants claimed the protection of the buyer-seller exception rule. In both cases, however, there was evidence from which the fact finder could infer (a) that the sellers shared with the buyers an interest and a stake in the buyers' intention to resell the drugs, and (b) that the buyers shared with their sellers an intention to be a continuing part of, and to further, the sellers' drug selling operation. The evidence was sufficient in each case to show that the sellers and buyers had joined in a cooperative venture, in which both buyers and sellers had a stake in additional transfers of drugs beyond the transfers from the original seller to the original buyer.

To explain how the evidence in this case showed a conspiratorial relationship joining the appellants Minott, Fuller, and Baker with the selling organization, it is useful to refer to prior opinions of our court which have described in geometric terms characteristic patterns of drug distribution conspiracies between sellers and buyers. One conventional pattern is sometimes

described as a "spoke" or "wheel" conspiracy, another as a "chain."[4] Both patterns are present here.

The spoke or wheel analogy is used to describe a core seller, or selling group, the hub, which sells to numerous customers, some of whom may become the "spokes." In part for reasons discussed above in our discussion of the buyer-seller rule, a single purchase of drugs, without more, would in many instances not make the purchaser a member of a conspiracy. However, the more a purchaser associated himself with the selling core of the wheel conspiracy – the more, for example, that he came to depend on the hub selling group as a stable, dependable source of supply – the more basis there would be to find that the purchaser had a stake in the drug selling venture of his suppliers, and accordingly the more basis there would be to find that such a purchaser had become a member of the selling conspiracy with a stake in the sellers' other sales. Furthermore, assisting the selling group in identifying and distributing to other regular customers tends to show such a stake in the venture.[5]

---

[4]We are mindful of Judge Friendly's warning that "the common pictorial distinction between 'chain' and 'spoke' conspiracies can obscure as much as it clarifies." *Borelli*, 336 F.2d at 383. However, Judge Friendly's concerns in *Borelli* that the links at either end of a long chain conspiracy "may have no reason to know that others are performing a role similar to theirs" or that, over time, "certain links continue to play the same role but with new counterparts," *id.*, do not apply here. In this case, the chains demonstrated by the evidence are only three links long.

[5]We do not imply that a single purchase of drugs from a drug-selling conspiracy cannot serve as a basis to find that the purchaser has joined the conspiracy. *See Hawkins*, 547 F.3d at 73 (noting that we have "rejected a sufficiency challenge brought by a defendant whose participation was limited to a 'single transaction' because 'the evidence permit[ted] an inference that the defendant had knowledge of the conspiracy and intended to join'" (quoting *United States v.*

16

The chain metaphor refers to a pattern of drug distribution in which one sells to another, who then sells to a third, etc. *See, e.g.*, *Borelli*, 336 F.2d at 382-84 (discussing the features of a chain conspiracy). One who establishes a continuing business of selling drugs in large, wholesale quantities knows that the success of his selling business depends on the ability of his customers to resell to others, who in turn will resell to still others, until the product ultimately is sold to retail consumers. The more the wholesale seller hopes, in the interest of the success and profitability of his own business, to have a purchaser of wholesale quantities as a regular, repeat customer, the more the seller has an interest and a stake in that purchaser's ability to resell successfully, and consequently the more basis there may be for finding that the seller's supplying of drugs to the buyer to enable the buyer to resell to others may be a conspiracy between the seller and the buyer to bring about those resales.

Both the chain and the spoke analogies support the sufficiency of the evidence in this case, notwithstanding the buyer-seller exception, to show that each of the appellants was in a conspiracy with the selling group to distribute crack cocaine. All three appellants purchased with such frequency and in such quantity from the selling group to support a finding that each of them depended on it as a source of supply and thus had a stake in the group's success in selling to others so as to assure its continued availability as a source. Minott and Fuller joined into the drug distribution efforts of the selling group in other ways, as well. Minott brought the selling

*Miranda-Ortiz*, 926 F.2d 172, 176 (2d Cir. 1991)).

group additional personnel, introducing his roommate Ramsey who then was recruited to handle one of the drug-order phone lines. Minott himself subsequently made deliveries for the selling group at Ramsey's request. Minott also introduced one of his intermediaries, Pops, to the selling group as a customer (although he appears to have regretted this decision when Pops began to make purchases from Dizzy without Minott's knowledge). Fuller assisted the drug distribution effort by selling crack in small quantities at the Taylor Avenue house since the selling group did not sell crack in quantities smaller than an eightball.[6]

At the same time, the selling group had a meaningful stake in the success of the resale efforts of their regular, wholesale customers, Minott, Fuller, and Baker, so that they could continue to be customers. *Cf. Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) ("[F]acts, such as quantity sales, high pressure sales methods, abnormal increases in the size of the buyer's purchases, etc., which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller knows the buyer has an illegal object and enterprise."); *Borelli*, 336 F.2d at 384 ("A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods over an uncertain period of time, and the circumstances may also warrant the inference that a supplier or a purchaser indicated a willingness to repeat."). The selling group's

---

[6]While there was no evidence that Baker furnished such additional support to the selling group, the evidence was nonetheless more than adequate to show that his repeated purchases in wholesale quantities gave him a stake in the success and continued availability of his source of supply, as well as that the selling group had a stake in his resales.

interest in Fuller's sales was demonstrated further by the fact that they provided him with drugs on credit, relying on his ability to resell to secure payment to themselves. *See Hawkins*, 547 F.3d at 76.

In short, with regard to all three appellants, there was ample evidence that they joined in the selling group's spoke conspiracy, having an interest and a stake in its success in maintaining itself as a reliable source of drugs for them by continuing to sell profitably to others. And, because appellants were shown to purchase crack in wholesale quantities, there was ample evidence from which the jury could find that the selling group joined in a conspiracy with each of them, having a stake and interest in the success of their resales of the drugs they purchased so that they could continue to be profitable customers of the selling group. The evidence supported a jury finding of a conspiracy between each of the appellants and the selling group for drug distributions other than the sales to the appellants. The buyer-seller exception is not an obstacle to a finding that the appellants conspired with the selling group to distribute crack cocaine, as charged.

**II. Fuller's Conviction on Counts 37 and 38**

Fuller contends that the evidence is legally insufficient to convict him of possession of crack cocaine on June 22, 2005 and July 1, 2005 as charged in Counts 37 and 38 of his indictment because the government did not present any evidence showing that Fuller actually possessed crack cocaine on those dates. In the district court, however, Fuller conceded in his motion for a new trial that "there was sufficient evidence, though circumstantial, for a reasonable

19

jury to find [Fuller] guilty of the substantive conduct alleged in Counts 37 and 38 of the Fifth Superseding Indictment." Accordingly, we will not review his claim on appeal.

### III. Fuller's *Kimbrough* Claim

Fuller contends that he should be re-sentenced in light of *Kimbrough v. United States*, 128 S. Ct. 558 (2007), which held that the cocaine guidelines are advisory only, and that a district court may consider the disparity in the Guidelines' treatment of crack and powder cocaine offenses in sentencing. *Id.* at 564, 570; *United States v. Regalado*, 518 F.3d 143, 146 (2d Cir. 2008). The Government agrees with Fuller that the case should be remanded, so that the district court can determine whether to re-sentence Fuller. In light of the Government's concessions, we remand for reconsideration of his sentence.

### CONCLUSION

The Judgments for Appellants Minott and Baker are affirmed. The Judgment for Appellant Fuller is affirmed, but his case is remanded for reconsideration of his sentence in light of *Kimbrough*.