**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 30, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

IAN ALEXANDER BOWLINE,

    Defendant - Appellant.

No. 15-7053
(D.C. No. 6:14-CR-00049-JHP-1)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

To establish a conspiracy to distribute Oxycodone, the government must prove that two or more people agreed to distribute—i.e., transfer—that drug. And in this case, the government undoubtedly proved that various individuals agreed with Ian Bowline to transfer to him some of the Oxycodone they obtained via the counterfeit prescriptions he created. But an agreement between two people that one will transfer drugs to the other can't form the basis of a conspiracy to distribute; otherwise, every drug sale would constitute a conspiracy. And while some of Bowline's confederates knew Bowline also sold Oxycodone for profit, the government presented no evidence that Bowline's confederates shared with him this distribution objective. Instead, their

---

[*] This order and judgment isn't binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

only objective was to acquire Oxycodone and divvy it up amongst themselves, with everyone taking either a share of the pills acquired or cash in lieu of their share.

Because the only distribution objective that Bowline shared with his confederates was the objective to transfer Oxycodone to Bowline, we vacate his conviction for conspiracy to distribute, or to possess with intent to distribute, Oxycodone. And because that alleged conspiracy forms the basis of Bowline's conviction for interstate travel in aid of a racketeering enterprise, we vacate that conviction as well.

## BACKGROUND

A grand jury indicted Ian Bowline for one count each of (1) conspiracy to distribute, and to possess with intent to distribute, Oxycodone, *see* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846; and (2) interstate travel in aid of a racketeering enterprise, *see* 18 U.S.C. § 1952(a)(3).

In part, the indictment alleged that Bowline and his confederates "acquired large quantities of Oxycodone . . . for the purpose of . . . distributing Oxycodone to others for profit." R. vol. 1, 20. Likewise, in its opening statement, the government told the jury that Bowline "devise[d] a scheme to buy and sell Oxycodone." R. vol. 2, 36. But despite these allegations of distribution for profit, the government's evidence at trial focused almost exclusively on how Bowline and his confederates conspired to acquire Oxycodone and divide the fruits of their endeavors amongst themselves.

Their plan was straightforward: Bowline created counterfeit prescriptions for Oxycodone, and his confederates—acting individually or in small groups—passed

2

those prescriptions at various pharmacies. In exchange for their time and trouble, his confederates kept either a share of the pills they acquired, cash in lieu of their share, or some combination of the two. The rest of the pills went to Bowline.

For instance, Christopher Robb testified that on one occasion, Bowline created and provided Robb with a counterfeit prescription for 120 Oxycodone pills. In exchange for passing that fake prescription, Bowline agreed Robb could keep 30 of the pills.

Bowline made similar arrangements with Elizabeth Portugal and Ryan Snodgrass. On one occasion, Snodgrass used Richard Dandridge's ID to pass a prescription that Bowline manufactured. Snodgrass and Dandridge then "split . . . 10 or 20" of the pills and Bowline "received the rest." R. vol. 2, 287. Others, including Amanda Burleson and her boyfriend David Merrill, crossed state lines to fill the prescriptions that Bowline manufactured. After acquiring the Oxycodone and delivering a portion of the pills to Bowline, they either kept the remaining pills or accepted cash from Bowline in lieu of their share. Blake Gower, on the other hand, didn't keep any of the pills from the false prescriptions he passed; instead, he received only cash for his participation.

During its closing argument, the government focused on this evidence establishing that Bowline (1) created fake prescriptions; (2) gave those prescriptions to others to pass; and (3) received a portion of the pills those individuals acquired. The government asserted that the "essential objective of the conspiracy" was to "[t]o *obtain* Oxycodone," not to sell it for a profit. R. vol. 2, 539 (emphasis added). And

3

the government argued that Bowline became involved in the conspiracy in order "to feed his habit," *id.* at 540, not—as it alleged in the indictment—"for the purpose of . . . distributing Oxycodone to others for profit," R. vol. 1, 20. Further, the government summed up its theory of the conspiracy thusly: "[Bowline] needed pills, [his confederates] needed pills, he had the skills to prepare the paperwork, they provided the labor to deliver the paperwork, to get the pills and to bring the pills back to him so that he could have his cut." R. vol. 2, 556. Finally, the government suggested this evidence was sufficient to establish a conspiracy to distribute; it told the jury, "You can distribute without selling the pills to someone. Giving them to someone is enough." R. vol. 2, 537.

The jury agreed this evidence was sufficient, and convicted Bowline of conspiracy to distribute, and to possess with intent to distribute, Oxycodone. It also convicted him of interstate travel in aid of a racketeering enterprise. The district court imposed a 108-month prison sentence. Bowline appeals.

## DISCUSSION

Bowline argues the government failed to present sufficient evidence to support either of his convictions. In evaluating his argument, "[w]e view the evidence in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of [each] offense beyond a reasonable doubt." *United States v. Sparks*, 791 F.3d 1188, 1190-91 (10th Cir. 2015).

Bowline concedes the government presented sufficient evidence to prove he conspired to possess Oxycodone. But he argues the evidence was insufficient to

4

prove he and his confederates conspired to distribute, or to possess with intent to distribute, that drug. Specifically, he asserts the government failed to present any evidence that he and his confederates possessed a shared distribution objective. *See United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992) (explaining that consumer who doesn't "share the distribution objective . . . would not be part of a conspiracy to *distribute* crack cocaine," although he or she might be guilty of "conspir[ing] to *possess* crack cocaine"); *see also United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir. 1987) ("In order for the [g]overnment to establish a case of conspiracy against the defendant, it must sufficiently prove that the defendant had a common purpose with his coconspirators to possess and distribute cocaine.").

The government maintains it presented sufficient evidence to support Bowline's conviction for conspiring to distribute, and to possess with intent to distribute, Oxycodone. But it doesn't appear to challenge Bowline's assertion that, in order to do so, it had to prove he and his confederates possessed a shared distribution objective. In fact, the government appears to concede as much. Instead, the government points to three types of evidence that it says are sufficient to prove a shared distribution objective.

First, the government doubles down on the theory it advanced during its closing argument: it argues that Bowline and his confederates agreed to share drugs amongst themselves, and that agreeing to share drugs—as opposed to agreeing to sell them for profit—is sufficient to establish a conspiracy to distribute.

5

We agree that "[t]he sharing of drugs constitutes distribution." *United States v. Asch*, 207 F.3d 1238, 1245 n.8 (10th Cir. 2000). Likewise, we agree that the government proved beyond a reasonable doubt that Bowline and his confederates agreed to share drugs. For instance, the government presented evidence that Bowline had an agreement with Portugal: Portugal agreed to use a false prescription to acquire Oxycodone pills and to then physically transfer a certain number of those pills to Bowline. Thus, Portugal and Bowline agreed that Portugal would distribute Oxycodone to Bowline. *See* 21 U.S.C. § 802(11) (defining distribution to mean "deliver[ing] . . . a controlled substance"); *id.* § 802(8) (defining "delivery" to "mean the actual, constructive, or attempted transfer of a controlled substance . . . whether or not there exists an agency relationship"); *Asch*, 207 F.3d at 1245 n.8 (explaining that sharing drugs constitutes distribution). And Bowline had similar agreements with several other individuals.

But the fact that Bowline agreed with his confederates that they would distribute Oxycodone to Bowline doesn't mean the government proved Bowline and his confederates conspired to distribute, or to possess with intent to distribute, Oxycodone. That's because an agreement between a drug transferor and a drug transferee, standing alone, can't form the basis of such a conspiracy. *See United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) ("[N]otwithstanding that a seller and a buyer agree together that they will cooperate to accomplish an illegal transfer of drugs, the objective to transfer the drugs from the seller to the buyer cannot serve as the basis for a charge of conspiracy to transfer drugs."). To hold otherwise would convert every drug sale into a conspiracy. *See*

6

*United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994) (explaining that "conspiracy requires proof of 'an agreement to commit a crime other than the crime that consists of the sale itself,'" and that if "the rule [were] otherwise, every narcotics sale would constitute a conspiracy" (quoting *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993))).

Accordingly, to the extent that Bowline entered into agreements with his various confederates under which they agreed to distribute Oxycodone to Bowline by delivering to him a share of the pills they acquired by passing the counterfeit prescriptions, those agreements are insufficient to support Bowline's conviction for conspiracy to distribute.

Next, the government argues that "many of the co-conspirators here did share a clear goal to sell a certain number of the pills." Aplee. Br. 25. The government doesn't provide a citation to the record to support this assertion. *See* Fed. R. App. P. 28(a)(8)(A), (b) (requiring appellee's brief to provide "citations to the . . . parts of the record on which the appell[ee] relies"). But our independent review of the record reveals at least some testimony to that effect: Jeremy Corona testified that after passing a counterfeit prescription, he allowed Robert Kohne to keep Corona's share—i.e., 15 to 20 pills—so that Kohne could "flip them" for money and then "bring the money back" to Corona. R. vol. 2, 391

Yet this evidence establishes only that Corona and Kohne "share[d] a clear goal to sell a certain number of the pills." Aplee. Br. 25. It doesn't establish that Bowline shared this objective, or even that he knew about it. And we see no other evidence in the record that would allow a jury to reach that conclusion. We can't say we find the dearth of such

7

evidence surprising; if it existed, we assume the government would have drawn the jury's attention to it during its closing argument. Instead, the government opted to focus on evidence establishing that Bowline and his confederates had a shared goal of acquiring Oxycodone and distributing some or all of it to Bowline. And for the reasons discussed above, that evidence is insufficient to prove a conspiracy to distribute. *See Parker*, 554 F.3d at 234; *Lennick*, 18 F.3d at 819.

Finally, the government points out that at least two of Bowline's confederates knew Bowline sometimes sold Oxycodone: both Merrill and Robb testified that they purchased Oxycodone from Bowline. And as Bowline acknowledges, Burleson testified—albeit without any elaboration—that she "kn[e]w [Bowline] was selling the pills." R. vol. 2, 137.

But mere knowledge that Bowline sold or intended to sell at least some of his share of the Oxycodone to others is insufficient, standing alone, to establish a shared distribution objective. *Cf. Evans*, 970 F.2d at 673 (finding insufficient evidence of shared distribution objective despite fact that defendant loaned scale to two individuals with knowledge they intended to use it to weigh crack cocaine); *see also United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013) ("Mere knowledge of further illegal use, for example, may make the seller an aider and abettor to further drug crimes committed by the buyer but not a co-conspirator."); *United States v. Boidi*, 568 F.3d 24, 30 (1st Cir. 2009) ("[A] conspiracy is an agreement between two (or more) parties having a shared 'objective' or 'design' to commit the crime, so mere knowledge by [defendant's suppliers] as to what [defendant] would do with the drugs [they sold him] is not enough

8

unless [defendant's suppliers] shared [defendant's] purpose to re-distribute" them.);

*United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008) ("Evidence that a buyer intends

to resell the product instead of personally consuming it does not necessarily establish that

the buyer has joined the seller's distribution conspiracy. This is so even if the seller is

aware of the buyer's intent to resell. It is axiomatic that more is required than mere

knowledge of the purpose of a conspiracy."); *Lennick*, 18 F.3d at 819 ("To show a

conspiracy, the government must show not only that [defendant] gave drugs to other

people knowing that they would further distribute them, but also that he had an

agreement with these individuals to so further distribute the drugs.").

Of course, the government is correct that a "common purpose or plan may be

inferred from the development or the combination of circumstances." *Jordan v. United*

*States*, 370 F.2d 126, 128 (10th Cir. 1966). Yet the circumstances in this case don't lend

themselves to an inference that Bowline and his confederates shared a common purpose

to *distribute* Oxycodone. Instead, as the government itself asserted during its closing

argument, they shared only a common goal "[t]o *obtain*" that drug. R. vol. 2, 539

(emphasis added). What each party did with the drugs after that was his or her own

affair, not the shared objective of a conspiracy. Accordingly, we vacate Bowline's

conviction for conspiracy to distribute, or to possess with intent to distribute,

Oxycodone.

That leaves Bowline's conviction for interstate travel in furtherance of the

conspiracy. *See* 18 U.S.C. § 1952(a)(3) (prohibiting traveling in interstate commerce

"with intent to . . . promote, manage, establish, carry on, or facilitate the promotion,

9

management, establishment, or carrying on, of . . . any business enterprise involving . . . narcotics or controlled substances" and thereafter performing or attempting to perform such an act).

To convict Bowline of interstate travel, the district court instructed the jury it had to find, in relevant part, that Bowline traveled from one state to another "with the intention to promote, manage, establish or carry on the activity described in Count One of the Indictment," R. vol. 1, 191, or that he aided or abetted another in doing so. In turn, the first count of the indictment alleged that Bowline conspired with others "to knowingly and intentionally possess with intent to distribute and distribute" Oxycodone. *Id.* at 19.

But because there was no shared distribution objective, there was no conspiracy to distribute. And because there was no conspiracy to distribute, Bowline necessarily couldn't intend to "promote, manage, establish, carry on, or facilitate" such a conspiracy. § 1952(a)(3). Accordingly, we vacate Bowline's interstate travel conviction as well.

In short, the government presented sufficient evidence to prove that Bowline and his confederates conspired to possess Oxycodone. Bowline acknowledges as much in his opening brief. And as Bowline acknowledged during oral argument, the government likewise presented sufficient evidence to establish that he and his confederates conspired "to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge." 21 U.S.C. § 843(a)(3).

10

But the government didn't pursue either of these charges. Instead, it sought to convict Bowline of (1) conspiracy to distribute and (2) interstate travel with the intent to promote such a conspiracy. That decision was, of course, within the bounds of the government's discretion. But its failure to present sufficient evidence of a shared distribution objective wholly constrains ours. Because no rational factfinder could have found beyond a reasonable doubt that Bowline and his confederates possessed a shared distribution objective, we reverse Bowline's convictions and remand to the district court with directions to vacate its judgment and sentence. The mandate shall issue forthwith.

Entered for the Court


Nancy L. Moritz
Circuit Judge

11