13-4846-cr
*United States v. Allen*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term 2014

(Argued:     November 4, 2014     Decided:     June 3, 2015)

Docket No. 13-4846-cr

———————————

UNITED STATES OF AMERICA,

*Appellee,*

v.

GEORGE ALLEN,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

Before:

WALKER, LYNCH, and CHIN, *Circuit Judges.*

———————————

Appeal from a judgment of the United States District Court for the District of Vermont (Reiss, *C.J.*), convicting defendant-appellant of conspiring to set fires on public lands. Defendant-appellant contends that (1) the evidence at trial was insufficient to support his conviction because the government failed to prove a specific intent to set fires on federal property, and (2) the district court violated his rights by conducting a jury orientation outside his and his counsel's presence.

**AFFIRMED**.

_____

WILLIAM B. DARROW, Assistant United States Attorney (Gregory L. Waples, Assistant United States Attorney, *on the brief*), *for* Eugenia Cowles, Acting United States Attorney for the District of Vermont, Burlington, VT, *for Appellee*.

MICHAEL K. BACHRACH, Law Office of Michael K. Bachrach, New York, NY, *for Defendant-Appellant*.

_____

CHIN, *Circuit Judge*:

The town of Wallingford, Vermont lies in the Otter Creek Valley, between the Taconic and Green Mountains, at the foot of the Green Mountain

National Forest (the "National Forest"). The National Forest encompasses some 400,000 acres of park land offering scenic natural attractions, including access to the Appalachian Trail and the Long Trail. Defendant-appellant George Allen ("Allen"), a volunteer firefighter and captain at the Wallingford Volunteer Fire Department (the "WFD"), appeals from a judgment entered in the United States District Court for the District of Vermont (Reiss, *C.J.*) on December 3, 2013, following a jury trial, convicting him of conspiring to set fires on public lands. As the evidence showed at trial, Allen and certain other members of the WFD were "bored," and conspired to set fires because it gave them "something to do" -- they would respond to the calls to extinguish the fires.

On appeal, Allen contends that (1) the evidence at trial was insufficient to convict him of conspiracy to set fires on public lands, in violation of 18 U.S.C. §§ 371 and 1855, because the government failed to prove a specific intent to set fires on federal property, and (2) the district court violated his right to be present under Rule 43(a) of the Federal Rules of Criminal Procedure and the Due Process Clause by conducting a jury orientation outside his and his counsel's presence.

We affirm.

*STATEMENT OF THE CASE*

**A.**    *The Facts*

Because Allen challenges the sufficiency of the evidence to support his conviction, "we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotation marks omitted).

In 2008, Allen was a volunteer captain in the WFD with a day job at an automotive tire shop in Rutland, Vermont. His brother, Jeff Allen, was Assistant Chief of the WFD, and their father, Warren Allen, was the Chief. A clique within the "Allen Hose Company," as it was sometimes referred to at the time, had been causing problems within the WFD, with Allen and some of the younger line firefighters "freelancing" at the scene of fires, deviating from standard protocol, disrespecting officers, and throwing "temper tantrums." S. App. at 111-12, 153.

Between January and May of 2008, a number of WFD firefighters became suspicious of the frequency and pattern of calls. There were twenty-four brush grass fires during a period when there might ordinarily be just one or two.

Additionally, the fires occurred during damp weather that would not ordinarily be conducive to wildland fires; they were not near roads, where a stray cigarette or other human intervention might have been the cause; certain members of the WFD clique, including Allen, were almost always on the team that responded to the calls; and members of the clique began boasting that they had the fastest response time in the county, and that they were beating everyone else to the scene.

One of the co-conspirators, Matt Burnham, looked up to the Allen brothers and joined the WFD as a junior firefighter at the age of fourteen. He was eighteen or nineteen years old, and already a senior firefighter, when he began setting the fires, admittedly because he was "bored" and looking for "something to do," *id.* at 203, and because it was "an adrenaline rush," *id.* at 206. "[S]tanding around at the fire station it would get mentioned that it would be nice to have a fire call. So we would go out and set a grass fire to get a fire call," he testified. *Id.* at 203. On at least one occasion after setting a fire, Burnham called 911 using a fake name. The emergency signal -- or "tone" -- would then go out, calling up the volunteer firefighters. Those who knew in advance where and

when there would be a fire prided themselves on their quick response time. Afterwards, Allen would occasionally reward Burnham with cigarettes.

Another co-conspirator, Charlie Woods, joined the WFD junior firefighter program when he was fifteen years old, and was seventeen at the time of the 2008 fires. Like Burnham, he looked up to Allen and loved being a firefighter. Woods testified that in early 2008 "it seemed like forever that [they] hadn't had a fire call or anything. And it was mainly like kind of getting boring." *Id.* at 368. Woods, Burnham, Allen, and Allen's girlfriend decided to start a couple fires, but "it got out of control." *Id.* According to Woods, during the period in question he would occasionally get text messages from Allen, or Allen's girlfriend, saying that they were bored at work and did not want to be there. Burnham or Woods would start a fire and then go to Rutland or back to their houses to wait. After the tone went out calling up volunteer firefighters, they would occasionally wait another fifteen or twenty minutes before they went to the firehouse so that the firefighters who were not involved would not become suspicious.

Between Burnham and Woods, the firefighters set two fires in January 2008 and one fire in March. Then, in April, they set sixteen fires,

including one on April 17 on federal land at the Long Trail and Appalachian Trail parking lot and trail head. In May 2008 they set at least four more fires, including one on federal land at the National Forest White Rocks picnic area near Ice Bed Road. In April and May of 2008, the National Forest fires were investigated by Kim Kinville, a law enforcement officer for the United States Forest Service, who at the time had been stationed in the National Forest for seventeen years.

### 1. *First Federal Fire*

On April 17, 2008, Burnham started a brush fire at the Long Trail and Appalachian Trail parking area in the National Forest. At trial, Burnham testified that Allen "named more than one good location" for fires, including specifically telling Burnham that the Long Trail parking lot would be a good place to start a fire. *Id.* at 207. And so, on April 17, Burnham went up to the Long Trail turnaround and set some leaves on fire. When Burnham was pulling out of the parking lot, Allen was pulling in. They both then returned to their respective homes. Burnham called 911 and reported the fire using a fake name,

and thereafter Burnham and Allen responded to the fire with other WFD firefighters.[1]

## 2.    *Second Federal Fire*

Woods testified that in early May 2008 there was discussion with Allen and Burnham that the White Rocks parking area was one of the places where a fire should be set. Woods and Burnham's initial attempt at starting a fire at White Rocks failed. The two fires they set simultaneously at the picnic area petered out because the grass was too wet, and the fires were too small to warrant a call. But a couple days later, on May 8, Allen texted Woods saying that he did not want to be at work. Woods then went up alone into the woods near the White Rocks parking lot.

After successfully setting fire to some leaves, Woods drove to the tire shop in Rutland and told Allen that "we're going to get a fire call and it's probably going to be at White Rocks." *Id.* at 376. Woods then went back to White Rocks, saw how large and volatile the fire was, and called it in himself using his real name because "I wanted to pretty much give myself up. . . . I didn't

---

[1]    A Vermont State Police Arson Unit officer testified at trial that -- based on the WFD's run sheets -- Allen and Burnham responded to all of the twenty-four suspicious fires.

want to do it anymore. I -- it wasn't me." *Id.* He then left the scene, went to the firehouse, and responded to the tone with other firefighters, including Allen.

After the fire was extinguished, Burnham, Woods, and Allen rode back to the firehouse together in Engine One. Allen told Burnham and Woods to "shut our mouths and not talk about it," and to "just act like we don't know what happened." *Id.* at 377.

**3.** *Allen's Confession*

On May 20, 2008, in a recorded interview at the WFD with a Vermont State Police detective, Allen stated that at times he was a reluctant participant, telling Burnham by text that he "need[ed] to stop" and that he was an "idiot" for setting the fires. *Id.* at 293. But they continued to set fires, and as Allen described it, Burnham and Woods were engaged in something of a "pissing match." *Id.* at 298.

Allen did, however, admit his knowledge of or involvement in as many as sixteen of the fires, though he did not concede that he lit any of them himself. Like Burnham and Woods, he was "[b]ored," and thought "this place, [this] town, is pretty boring around here." *Id.* at 282. With regards to the May 8 fire at White Rocks, Allen told Detective Williams that Woods "set the federal

fire," but said that he did not know why Woods did it. *Id.* at 298. And as for the April 17 fire, Allen admitted to the detective that he told Burnham to set it near the Long Trail parking area, but contended he picked it simply as a random location where they likely would not be caught.

**B.**     *The Proceedings Below*

In an indictment filed on September 19, 2012, Allen was charged with knowingly and willfully conspiring with other members of the WFD, including Burnham and Woods, to willfully set on fire underbrush and grass on the public domain, in violation of 18 U.S.C. § 1855.

At a pre-trial conference on June 24, 2013, with Allen in attendance, Chief Judge Reiss reviewed with the parties her trial practices, including jury orientation and selection. "You are welcome to attend jury orientation," she told the parties. "It will be the morning of the jury draw. You do not have to, but I don't see any reasons why you shouldn't be present if you want to." *Id.* at 8. On July 22, 2013, on the morning of the jury draw, Chief Judge Reiss conducted the jury orientation, without Allen or either counsel present. Trial commenced that afternoon.

The government's case-in-chief involved nine witnesses, including two WFD officers; a United States Forest Service law enforcement officer; Allen's co-conspirators at the WFD, Burnham and Woods, who testified that Allen encouraged and directed them to set the fires and suggested locations; a Vermont State Police detective, who introduced Allen's recorded admission that he directed Burnham to set the first National Forest fire; the Wallingford fire warden, who testified that the WFD failed to report any of the twenty-four fires in question, despite a legal requirement to do so; and two witnesses who introduced cell phone evidence showing a heavy volume of communications between Allen and Burnham during the first National Forest fire.

After the government rested, the defense moved for a judgment of acquittal on the grounds that there was insufficient evidence of Allen's intentional involvement in the federal fires. The district court denied the motion. Allen did not call any witnesses. The jury delivered a guilty verdict on July 24, 2013, just two days after the trial commenced. On December 2, 2013, the district court sentenced Allen principally to a term of thirteen months' incarceration.

This appeal followed.

*DISCUSSION*

Two issues are presented: (a) the sufficiency of the evidence of a conspiracy to set fire to public lands, and (b) the propriety of the jury orientation conducted by the district court outside the presence of Allen and his counsel.

**A.** *Sufficiency of the Evidence*

We review claims of insufficient evidence *de novo*, *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004), and will affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (internal quotation marks omitted). "A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002) (internal quotation marks omitted).

Here, Allen's sufficiency argument turns primarily on a question of law. He argues that there was insufficient evidence to support his conviction for conspiracy to set fire to public lands because of the absence of evidence of specific intent to set fire to federal lands. Allen contends that 18 U.S.C. § 1855 requires knowledge that the lands to be set ablaze are federal, and that conspiracy to violate § 1855 requires the same. We hold, to the contrary, that

specific knowledge of federal ownership is not required, either for the substantive statute or for conspiracy to violate the substantive statute.

The principal question presented is whether a violation of § 1855 requires that the defendant know that the land is federal land. The statute provides in pertinent part:

> Whoever, willfully and without authority, sets on fire any timber, underbrush, or grass or other inflammable material upon the public domain or upon any lands owned or leased by or under the partial, concurrent, or exclusive jurisdiction of the United States . . . shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1855. We must decide whether the element of intent embodied in the word "willfully" includes not only the defendant's setting on fire of timber, underbrush, or grass, but also the defendant's knowledge that the lands are federal. In deciding this question of first impression we look to the language of the statute, *see Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004), the intent of Congress as expressed in the legislative history, *see United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000), and cases involving the interpretation of this and similar statutes.

The issue is whether the phrase "willfully and without authority" modifies just the act of setting a fire, or whether it reaches more broadly to require that the defendant "willfully and without authority" set the fire knowing it to be "upon the public domain or upon any lands owned or leased by or under the partial, concurrent, or exclusive jurisdiction of the United States." 18 U.S.C. § 1855. While it is clear that the fire must be set on federal lands to invoke federal jurisdiction, we must decide whether the defendant must know or intend that the fire be set on federal lands.

Though the statute has been amended several times since it was enacted in 1897,[2] the record is silent as to Congress's precise intent in creating a federal crime corresponding to a pre-existing common-law prohibition. *See, e.g., Phillips v. State*, 19 Tex. 158 (1857); Jay P. Kinney, *The Essentials of American Timber Law* § 101 at 127-28 (1917). It is clear enough, though, that Congress generally intended "to prevent forest fires which have been one of the great economic

---

[2] *See* Act of February 24, 1897, ch. 313, 29 Stat. 594 (crime to "willfully and maliciously" set a fire or "carelessly or negligently" leave one to burn unattended); Act of May 5, 1900, 31 Stat. 169 (amended, omitting words "carelessly or negligently"); Act of March 4, 1909, 35 Stat. 1088, 1098 (amended, omitting word "maliciously"); *see also* Act of June 25, 1910, 36 Stat. 855, 857 (amended, applying also to Indian tribal lands or Indian allotments while held under restricted or trust patents); Act of November 5, 1941, 55 Stat. 763 (amended, adding "and without authority"); Act of June 25, 1948, ch. 645, 62 Stat. 788 (current version at 18 U.S.C. § 1855).

misfortunes of the country." *United States v. Alford*, 274 U.S. 264, 267 (1927) (interpreting a related statute, Act of June 25, 1910, ch. 431, 36 Stat. 855, that prohibited building a fire in or near any forest and failing to totally extinguish it); *see also United States v. Hacker*, 73 F. 292, 295 (S.D. Cal. 1896) ("The policy of the government in [making it a misdemeanor to cut timber on public lands] and kindred legislation was to protect the timber on the public domain, except as against certain necessary and specified uses in tillage and mining.").

The case law pertaining to the elements of timber crimes is similarly thin. Very few cases have dealt with sufficiency of the evidence for a § 1855 conviction, *see, e.g.*, *United States v. Velte*, 331 F.3d 673 (9th Cir. 2003); *United States v. Abner*, 35 F.3d 251 (6th Cir. 1994); *United States v. Newman*, 6 F.3d 623 (9th Cir. 1993), and none has clearly addressed the scope of the willfulness requirement. Allen relies on the Sixth Circuit case, *Abner*, to support his assertion that the "willfulness" element of § 1855 applies not only to setting the fire, but to doing so knowing the lands were federal.

In *Abner*, the defendant set fire to private land, and the fire spread to federal land -- the boundary of which was located anywhere from 300 to 1000 feet from the fire's origin -- due to the wind and dry conditions. The government

asked the jury to infer that Abner "knew that the fires which were started on private property would spread to public property, that Abner and his cohorts willfully started the fires on private property, and that they started the fires on private property with the specific intent that they spread onto federal property." *Abner*, 35 F.3d at 255. Abner was convicted of a substantive § 1855 offense, and the Sixth Circuit reversed on the grounds that no "rational jury could convict Abner for *willfully* setting on fire lands owned by the federal government." *Id.*

Allen's reliance on *Abner* is misplaced. The Sixth Circuit's analysis focused on whether the defendant knew that the fire would likely spread to federal land, and the government argued that Abner's willful burning of private lands could be used to show an intent to burn federal land. But in the end, *Abner* is equivocal as to the precise nature of the specific intent that Abner lacked. Although the Sixth Circuit emphasized that there was "no evidence that Abner knew that the area contained government land," *id.* at 256, the court adopted the enumeration of elements for a § 1855 violation set forth in its unpublished (and incongruously-named) decision in *United States v. Rainwater*, where it held that the government had only to prove "1) that Rainwater burned land owned by the United States, 2) that Rainwater did not have authority to set the fire, and 3) that

- 16 -

Rainwater set the fire willfully."  No. 92-5504, 1993 WL 47198, at *2 (6th Cir. Feb.

23, 1993) (per curiam).[3]  The elements as stated in *Rainwater* accord with our

ultimate holding, that § 1855 requires only "that [the defendant] set the fire

willfully," and not that he set fire to land knowing it was federal land.  *Id.*

We need not decide the exact nature of the intention that *Abner*

required, or how we would decide a case like it, because the case is

distinguishable from ours, and presents a different defense.  Allen argues that he

intentionally set a fire on land that he did not know was federal land; Abner, in

contrast, argued that he intentionally set a fire on land that was *not* federal, and

had no intent that the fire spread to the land that was part of the federal domain.

To the extent that the Sixth Circuit held that the government needed to prove an

intention that the fire spread to land protected by § 1855, that holding provides

no defense for Allen.

In light of the lack of direct judicial authority on willfulness in

---

[3]      In one instance, *Abner* states the third element differently from *Rainwater*, despite citing to *Rainwater* for the proposition.  *Compare Abner*, 35 F.3d at 254 (the government had to prove that "Abner set this land on fire willfully"), *with Rainwater*, 1993 WL 47198, at *2 (the government had to prove that "Rainwater set the fire willfully").  Because the *Abner* articulation refers to *this* -- the federal -- land, it is more ambiguous than *Rainwater* on the scope of willfulness.

§ 1855 and the paucity of legislative history, we turn for guidance to cases that have discussed the federal knowledge requirement with respect to similar statutes.

A line of cases starting with the Supreme Court's decision in *United States v. Feola* provides strong support for the conclusion that for purposes of § 1855 federal title to the land is merely a jurisdictional prerequisite and that knowledge thereof is not an element of the substantive offense. 420 U.S. 671 (1975). In *Feola*, the Supreme Court considered a conviction for conspiracy to violate 18 U.S.C. § 111, which prohibits assault on a federal officer. The *Feola* Court explored whether anti-federal scienter -- the Court's term for specific knowledge that the victim is a federal officer -- is required for the substantive statute as well as for conspiracy to violate the substantive statute. The Court held that § 111 does not require awareness on the part of the assailant that her victim is a federal officer. The statute exists, the Court concluded, "to accord[] maximum protection to federal officers . . . . All the statute requires is an intent to assault, not an intent to assault a federal officer." *Feola*, 420 U.S. at 684. The Court continued:

> The situation is not one where legitimate conduct
> becomes unlawful solely because of the identity of the

individual or agency affected.  In a case of this kind the offender takes his victim as he finds him.  The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum.

*Id.* at 685.

In *United States v. Yermian*, the Supreme Court extended the *Feola* principle to 18 U.S.C. § 1001, which prohibits willfully making false statements to federal agents.  468 U.S. 63, 68 (1984) ("Jurisdictional language need not contain the same culpability requirement as other elements of the offense.").  And in *United States v. LaPorta*, we applied *Feola* to 18 U.S.C. § 1361, which prohibits willful injury or depredation against federal property.  46 F.3d 152, 158 (2d Cir. 1994) ("The defendants argue that to be convicted of destruction of government property . . . the government must show that they knew the government owned the property in question.  We find no such scienter requirement under § 1361.").  The "willfulness" language in § 1855 fits squarely with our interpretation in *LaPorta* of the "willfulness" language in § 1361.

While the Supreme Court has read "some criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them," those cases involved statutes that criminalized

"otherwise innocent conduct."  *LaPorta*, 46 F.3d at 158 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994) (internal quotation marks omitted)); *see also Staples v. United States*, 511 U.S. 600, 619 (1994); *Liparota v. United States*, 471 U.S. 419, 426 (1985); *Morissette v. United States*, 342 U.S. 246, 271 (1952).  "Arson is hardly 'otherwise innocent conduct.'"  *LaPorta*, 46 F.3d at 158.[4]  In each of the cases cited in *LaPorta*, the element as to which the Supreme Court implied a scienter requirement was not a mere jurisdictional element, but was the very element that made the conduct dangerous or criminal.

We conclude that § 1855 is more in line with the statutes at issue in *Feola* and its progeny than with the statutes at issue in *Morissette* and similar cases.  Just as the "willfulness" language in § 1361 at issue in *LaPorta* refers to the

---

[4]   Allen points to § 1855's sister statutes, arguing that because they require federal scienter, so too does § 1855.  *See, e.g.*, 18 U.S.C. § 1851 (Coal Depredations); *id.* § 1852 (Timber Removed or Transported); *id.* § 1853 (Trees Cut or Injured); *id.* § 1854 (Trees Boxed for Pitch or Turpentine); *id.* § 1856 (Fires Left Unattended and Unextinguished); *id.* § 1857 (Fences Destroyed; Livestock Entering); *id.* § 1858 (Survey Marks Destroyed or Removed); *id.* § 1859 (Surveys Interrupted); *id.* § 1860 (Bids at Land Sales); *id.* § 1861 (Deception of Prospective Purchasers); *id.* § 1863 (Trespass on National Forest Lands); *id.* § 1864 (Hazardous or Injurious Devices on Federal Lands).  But Allen cites no authority for the proposition that these Chapter 91 statutes require knowledge that the timber, land, or resources are federal.  Furthermore, several of these statutes criminalize "otherwise innocent conduct," and none requires "willfulness" except for § 1858, which provides that whoever "willfully" destroys or defaces survey marks "on any Government line of survey" commits a crime.  No case has addressed the federal knowledge requirement for this section, and in any event the language in § 1855 accords more squarely with the statute in *LaPorta* than with § 1858.

depredation of property (not to the federal ownership of the property), the "willfulness" language in § 1855 refers to the setting of fires (not to the federal ownership of the lands on which they are set). Hence, we hold that § 1855 does not require knowledge that the lands are federal.

Allen contends that even if he could have been found guilty of a substantive § 1855 offense, there was insufficient evidence to establish a § 371 conspiracy conviction because he did not willfully enter into an agreement to burn federal lands, and, moreover, the object of any conspiracy was not specifically to burn federal lands. This argument fails. We conclude that conspiracy to violate § 1855 requires no greater scienter than the substantive crime requires.

The general federal conspiracy statute, 18 U.S.C. § 371, prohibits "two or more persons [from] conspir[ing] . . . to commit any offense against the United States." The elements of a conspiracy under § 371 are: "(1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an 'overt act' by one or more

members of the conspiracy in furtherance of the conspiracy." *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002).

While conspiracy to commit a substantive offense "cannot exist without at least the degree of criminal intent necessary for the substantive offense itself," *Ingram v. United States*, 360 U.S. 672, 678 (1959) (internal quotation marks omitted), neither does it require a greater degree of criminal intent than the substantive statute, *Feola*, 420 U.S. at 692 ("[W]here a substantive offense embodies only a requirement of mens rea as to each of its elements, the general federal conspiracy statute requires no more."). On this question, the *Feola* Court held that, "[g]iven the level of intent needed to carry out the substantive offense, we fail to see how the agreement is any less blameworthy or constitutes less of a danger to society solely because the participants are unaware which body of law they intend to violate." 420 U.S. at 694. Here, the co-conspirators knew they were agreeing to engage intentionally in unlawful conduct. Whether they thought they were agreeing to burn federal lands or non-federal lands, the law does not require that they were aware precisely "which body of law they intend[ed] to violate." *Id.* Because § 1855 does not require that the defendant

harbor specific intent to burn federal lands, the § 371 conspiracy offense requires no greater mens rea.[5]

## B.    *Right to be Present*

Allen contends that the district court's preliminary orientation with the jury panel outside his and his counsel's presence deprived him of his right to be present under Rule 43(a) of the Federal Rules of Criminal Procedure and the Due Process Clause of the Fifth Amendment.

As noted above, in a pre-trial conference, the district court informed the parties that it would be conducting a "jury orientation," and advised them that they were not required to attend, but were welcome to do so.  The district court proceeded to describe what it anticipated would take place at the orientation:

> I think in a criminal case it's interesting because in jury orientation I tell them the defendant is presumed innocent, he doesn't have to prove anything, he doesn't have to call any witnesses, he doesn't have to testify, he

---

[5]    In their briefs on appeal, the parties focus on the legal issue of the degree of scienter required for a § 1855 violation.  The government does suggest as a factual matter that Allen intended for the fires to be set on lands he knew to be federal.  The government notes that Allen admitted that he directed Burnham to set the fire near the Long Trail and Appalachian Trail parking area on April 17, 2008, and Woods testified that Allen instructed him to set the fire near the White Rocks parking area on May 8, 2008.  In light of our resolution of the legal issue, we need not decide the factual question.

doesn't have to cross-examine witnesses, the burden of proof is on the government, it has to prove guilt beyond a reasonable doubt.

I tell them that law enforcement officers are not entitled to any greater or lesser credibility because of their status as law enforcement officers.

And then when we get to jury draw people are saying, well, I don't think he'd be here if he wasn't guilty so I know the government would not waste our tax payers['] [money] if he wasn't there, and I certainly would get up and testify and I just can't imagine why anybody wouldn't testify.

So you [know that] I've already told them all this and they are already ignoring me. So it's sometimes helpful to see that.

Also just stressing how important this is and that they are upholding the [C]onstitution and this is what we're requiring [of] them. I go through a long discussion of juror misconduct all the times it's happened in my cases and colleagues' cases and what happens when it happens so that they are highly alerted to that issue.

S. App. at 8-9. Later in the conference, defense counsel asked for clarification:

Mr. Furlan: . . . As I understand it Your Honor will do general questions about their, the jurors' qualifications?

The Court: I won't do, I won't do any questions. What I will say is to sit on this jury you must do the following: You must reside in the district for at least a year, you must be able to read, fully participate in the trial with or without reasonable accommodation, you must not have

a felony, whatever the term is about the felony. And I read it right from the qualifications. Anybody whose got a problem with these please raise your hand we'll give you a piece of paper. So that's all I do.

Mr. Furlan: But no one will be removed at that point?

The Court: Right.

Mr. Furlan: And then we begin the voir dire and then we do everything after that?

The Court: Right.

*Id.* at 18.

The jury orientation took place the morning of the first day of trial, and the district court spent over an hour speaking with the potential jurors. Neither the government nor defense counsel attended, nor was Allen present. Although the district court had previously told counsel that "I won't do any questions," *id.*, in fact it asked questions of potential jurors and answered questions they posed on topics that would have been of interest to defense counsel.

The district court asked two sets of questions during the course of the orientation. First, the court asked: "Do we have anybody here who sat on a jury before? If you would raise your hand? And how

- 25 -

was your experience, ma'am?" App. at 26. The juror responded that it was "[i]nteresting . . . . [I]t was a sense of you're the decider of what the findings would be." *Id.* The district court then called on someone else, and a second juror responded that "[i]t was very interesting. I didn't expect it to end the way it did." *Id.* Later in the orientation, the district court asked a second set of questions:

> What the attorneys tell you and their statements and their questions are not evidence. And why do you think that is? So the attorneys are making opening statements, they are making closing arguments, they are asking questions, why would that not be evidence in the case? No takers?

*Id.* at 40. The district court then answered its own question without hearing from jurors.

The district court also answered four questions from prospective jurors: (1) what happens if the juror knows one of the attorneys in the case, (2) what if the juror dislikes how the federal government works, (3) whether the jury decides guilt and the sentence or just guilt, and (4) how the court addresses situations where "strong feelings" arise during deliberations, *id.* at 67.

The district court also discussed a number of issues, including: the "jigsaw puzzle" nature of evidence, *id.* at 33, evidentiary objections and the difference between direct and circumstantial evidence, judging credibility, following laws they disagree with, putting aside specialized knowledge, the importance of keeping an open mind and problems with juror bias, the duty of jurors to deliberate (and not to refuse to deliberate), the presumption of innocence, the mechanics of closing arguments, jury instructions and deliberation, and juror misconduct. It also provided a preview of issues that would be addressed during the preliminary charge to be given to the jury once it was impaneled. At one point, the district court referred to the OJ Simpson case, telling the potential jurors that some of them might be thinking, "I understand whatever happened in the OJ Simpson case is not what we're doing here and I can set that aside." *Id.* at 49. Later that afternoon, the parties conducted the voir dire as planned, the jury was selected, and the government gave its opening statement.

Allen contends that the morning orientation crossed the line into judge-conducted voir dire, and that he had a right to be present under Rule 43(a) and the Due Process Clause. Rule 43(a) provides that a defendant in a criminal

- 27 -

case "must be present at . . . every trial stage, including jury impanelment." Fed. R. Crim. P. 43(a). In addition to Rule 43(a), the Due Process Clause "requires a criminal defendant's presence 'to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" *United States v. Jones*, 381 F.3d 114, 121 (2d Cir. 2004) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934)).

Allen argues that automatic reversal of the conviction is required because his absence from the orientation was a "structural defect." Appellant's Br. 58-59. The argument fails. The Supreme Court has distinguished "trial errors," which are relatively limited in scope and are subject to harmless error review, from "structural defects," which require automatic reversal because they "affect [] the framework within which the trial proceeds." *United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir. 2000) (alteration in original) (internal quotation marks omitted). We have held that "[e]rrors are properly categorized as structural only if they so fundamentally undermine the fairness or the validity of the trial that they require voiding its result regardless of identifiable prejudice." *Yarborough v. Keane*, 101 F.3d 894, 897 (2d Cir. 1996). To differentiate trial errors from structural defects we look not only at the right violated, but also at the context of the violation. *Id.* at 898 ("[A] defendant's absence from certain

stages of a criminal proceeding may so undermine the integrity of the trial process that the error will necessarily fall within that category of cases requiring automatic reversal." (quoting *Hegler v. Borg*, 50 F.3d 1472, 1476 (9th Cir. 1995))).

Any error here, assuming there was error, did not "so fundamentally undermine the fairness or the validity of the trial" as to require voiding its result. *Id.* at 897. No prospective jurors were excused in the morning session, and a full voir dire was conducted in the afternoon. Even assuming a violation of the right to be present can be structural error in certain circumstances, we cannot conclude that the fairness of the trial was fundamentally undermined here. *See Johnson v. United States*, 520 U.S. 461, 468-69 (1997) ("We have found structural errors only in a very limited class of cases.").

Even absent a finding of structural defect, Allen argues that he had a right to be present under Rule 43, that this right was not and could not have been knowingly waived, and that this was not harmless error. This Court addressed a pre-trial ex parte communication between judge and jury in *Cohen v. Senkowski*, 290 F.3d 485 (2d Cir. 2002). There, the trial judge conducted a "pre-screening" of prospective jurors, questioning them individually in his chambers on, among other things, their prior knowledge of the case from pre-trial publicity. Cohen's

counsel was present for the pre-screening, though Cohen himself was not. Two jurors who indicated during the pre-screening that they had knowledge of the case from media reports were eventually seated on the jury. *Id.* at 487.

On review of the district court's denial of federal habeas, we held that "pre-screening of prospective jurors is a material stage of trial at which the defendant has a constitutional right to be present. Pre-screening of a jury venire is not comparable to [a] brief conference between judge and juror . . . nor a procedure at which a defendant's presence would be 'useless.'" *Id.* at 489. We distinguished the "pre-screening" of jurors, which involved a substantive inquiry into the jurors' qualifications, from the purely "administrative impanelment process" in cases like *United States v. Greer*, where prospective jurors were questioned, outside the presence of the defendant, on logistical matters such as personal hardship in serving. *Id.* at 490 (citing *Greer*, 285 F.3d 158, 167-68 (2d Cir. 2002)). In *Greer*, we noted that we had recently "reaffirmed that hardship questioning is not a part of voir dire -- and thus not a critical stage of the trial during which the parties and counsel must be present." 285 F.3d at 168; *see also Gomez v. United States*, 490 U.S. 858, 874 (1989) (distinguishing an "administrative

[i]mpanelment process" from the jurors' "first introduction to the substantive factual and legal issues in a case" during voir dire).

In our view, the orientation procedure utilized in the instant case was fraught with risk and the potential for problems. Outside the presence of Allen and counsel, the district court engaged in a discussion with prospective jurors about substantive legal issues, including the nature of evidence, the presumption of innocence, and the duty to deliberate. The court asked prospective jurors about prior jury experience, and prospective jurors asked the court about anti-federal government bias, whether the jury had a role in deciding the sentence, and how to deal with "strong feelings" in deliberations. Allen and his counsel surely would have wanted to be present for these exchanges: They might have objected to certain questions or comments (e.g., the comment about the OJ Simpson case), they could have asked for limiting or curative instructions or follow-up questioning (e.g., with respect to the question about anti-federal government sentiment), and they would have been able to observe the demeanor of those prospective jurors who spoke. All of these matters could have had an impact on their exercise of peremptory challenges or provided a basis for a

challenge for cause.[6] Clearly, it would have been preferable for the district court to have had the parties present for the orientation or, in the absence of the parties, for the district court to have limited itself to plainly logistical and administrative issues, leaving substantive discussion for voir dire and the preliminary charge after impanelment of the jury.[7]

Whether this orientation constituted a "material stage" of the trial at which Allen had a constitutional right to be present is a close question. The orientation was somewhere in between the "administrative impanelment process" at issue in *Greer*, where prospective jurors were asked only about logistical matters such as personal hardship, 285 F.3d at 168, and the "pre-screening" of prospective jurors in *Cohen*, which involved a substantive inquiry into the jurors' qualifications, 290 F.3d at 489-90. Here, the district court did more than merely inquire about logistical matters, and yet its conversation with

---

[6]     *See Lewis v. United States*, 146 U.S. 370, 373 (1892) (The defendant's "life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers in the selection of jurors.").

[7]     Many of the instructions given by the district court in the orientation are more appropriately given as part of the preliminary instructions at the beginning of trial after the jury has been impaneled. *See* 1 Leonard B. Sand, et al., Modern Federal Jury Instructions, ¶¶ 1.02 (Instructions at Beginning of Trial), 2.01 (Function of the Court, the Jury, and Counsel) (rev. 2011). In fact, as Allen notes, the transcript of the "orientation" is actually entitled "Preliminary Charge to the Jury Pool." App. at 22.

the prospective jurors was less fulsome than the inquiry in *Cohen*. We need not decide on these facts, however, whether Allen had a right to be present at the orientation. Even assuming he had such a right, we find that he waived it.

A defendant's right to be present at trial proceedings is subject to waiver. *United States v. Gagnon*, 470 U.S. 522, 528-29 (1985) (per curiam) (finding waiver where defendant failed to invoke Rule 43 right to be present at an in camera conference which he knew was taking place between the judge and a juror). In *Gagnon*, the Supreme Court held a defendant could waive his right to be present at trial by failing to assert that right:

> If a defendant is entitled under Rule 43 to attend certain "stages of the trial" which do not take place in open court, the defendant or his counsel must assert that right at the time; they may not claim it for the first time on appeal from a sentence entered on a jury's verdict of "guilty." . . . Respondents knew the District Judge was holding a conference with the juror and with Gagnon's attorney, yet neither they nor their attorney made any effort to attend. Timely invocation of a Rule 43 right could at least have apprised the District Court of the claim, and very likely enabled it to accommodate a meritorious claim in whole or in part. . . . We hold that failure by a criminal defendant to invoke his right to be present under Federal Rule of Criminal Procedure 43 at a conference which he knows is taking place between the judge and a juror in chambers constitutes a valid waiver of that right.

*Id.* at 529.

Waiver must be "[k]nowing and [v]oluntary," but it can be "implied from the defendant's conduct." *United States v. Nichols*, 56 F.3d 403, 416 (2d Cir. 1995). In *Cohen*, though we held that there was a constitutional right to be present during the jury pre-screening, we ultimately found that because Cohen knew of the pre-screening proceedings -- despite his claim that he did not know he had a right to attend -- he had impliedly waived his right by virtue of his voluntary absence. 290 F.3d at 490-93.

In this case, the argument for waiver is even more compelling: The district court explicitly invited Allen and his counsel to be present for the orientation. "You are welcome to attend jury orientation," the court told the parties. "It will be the morning of the jury draw. You do not have to, but I don't see any reasons why you shouldn't be present if you want to." S. App. at 8. The district court provided a general description of the session, and Allen was on notice that there would be some discussion of the law during the orientation. In fact, after mentioning some of the substantive legal principles that it would be discussing during orientation, the district court added that during voir dire,

jurors often ignore what it has already told them during orientation, "[s]o it's sometimes helpful to see that." *Id.*

Allen contends that he could not have waived his right to be present at the orientation because he was not fully informed of the nature of the orientation, going so far as to say the district court "mischaracterized" the session. Reply Br. 9-10. We are not persuaded. Our cases hold that "only minimal knowledge on the part of the accused is required when waiver is implied from conduct." *Nichols*, 56 F.3d at 416; *accord Cohen*, 290 F.3d at 491 (holding that "the trial court's actions in open court gave Cohen sufficient 'minimal' knowledge of the nature and purpose of the pre-screening procedure to conclude that he waived his right to be present"). The district court's description here was sufficient to give Allen "minimal knowledge" of the nature and purpose of the orientation.

Allen and his counsel were apprised of the nature and purpose of the orientation, but declined the district court's invitation to attend. Thus, we

hold that, even assuming Allen had a right to be present at the orientation, he knowingly and voluntarily waived it.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED**.